Affirmed and Majority and Concurring Opinions filed December
21, 2010.

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-08-00074-CR



 

DAVID MARK TEMPLE, Appellant

V.

STATE OF TEXAS, Appellee

 



On Appeal from the 178th
District Court

Harris County, Texas

Trial Court Cause No. 1008763



 

MAJORITY OPINION

Appellant, David Mark Temple, was convicted of the
murder of his wife, Belinda Temple, and sentenced to life imprisonment. 
Appellant challenges his conviction in eighty issues, which are grouped into
the following categories:

(1) the evidence is
legally and factually insufficient to support the jury’s verdict (issues one
and two);

(2) appellant’s
due-process rights were violated because of the State’s Brady violations
(issues three and four);

(3) the trial court
erred by allowing the prosecutor to cross-examine appellant regarding the
veracity of other witnesses (issues five through fourteen); 

(4) the trial court
erred by allowing the prosecutor to inject unsupported and inflammatory facts
during cross-examination of appellant (issues fifteen through twenty-four); 

(5) the trial court
erred by allowing the prosecutor to engage repeatedly in improper jury argument
(issues twenty-five through sixty-seven); and 

(6) the trial court
erred by overruling numerous hearsay objections (issues sixty-eight through
eighty).  

We affirm.

I.   Background

Appellant
was raised in Katy by Kenneth and Maureen Temple.  Interstate 10 (“I-10”) runs
east-to-west through Katy.  Kenneth and Maureen lived in a house north of I-10
and surrounded by fields in which appellant and his brothers, Darren and Kevin,
hunted.  At the time of Belinda’s death, Kenneth and Maureen still lived in
that house.

During
the mid-1980s, appellant was a star linebacker on the Katy High School football
team.  After high school, appellant played football at Stephen F. Austin State
University (“SFA”) in Nacogdoches.  During college, appellant met and began
dating Belinda.  While dating, appellant and Belinda acquired a Chow-mix dog
they named Shaka.  Appellant and Belinda married in 1992 and spent the next two
years earning post-graduate degrees from SFA and teaching and coaching in
Livingston.  

In 1994,
appellant and Belinda moved to Katy.  Appellant was employed as an assistant
football coach at Alief Hastings High School, and Belinda taught at Katy High
School.  They eventually bought a home south of I-10 in the Cimarron
subdivision, an approximately fifteen-minute drive from Kenneth and Maureen’s
home.  At the time of Belinda’s death, appellant and Belinda had a three-year
old son, E.T., and Belinda was almost eight-months pregnant, expecting a girl. 


On
Monday, January 11, 1999, Belinda was at work when she was informed E.T. was
running a fever at daycare.  During lunch, Belinda retrieved E.T. and took him home. 
At approximately 12:30 p.m., appellant arrived home to watch E.T., allowing
Belinda to return to her school until around 3:30 p.m.  Between 3:30 and 3:45
p.m., Belinda arrived at Kenneth and Maureen’s home to retrieve soup.  She
briefly spoke with Kenneth and then drove home.  Belinda arrived home sometime
before 4:00 p.m.  Appellant claims that, after Belinda arrived home, he and
E.T. left so that Belinda could rest.

According
to appellant, he drove his blue, short-bed pickup truck to the small park in
his neighborhood, Cimarron Park.  Appellant testified that shortly after
arriving at the park, he and E.T. decided to go to a larger park, Peckham Park,
several miles away, north of I-10.  Appellant claimed he stopped at a
Brookshire Brothers grocery store north of I-10 where he purchased drinks and
cat food.  Appellant and E.T. were videotaped entering the store at 4:32 and
leaving at 4:38.  Appellant testified he then decided to go to Home Depot to
look at shelving for the baby’s room.  Appellant and E.T. were videotaped
entering Home Depot at 5:14 p.m. but were not videotaped exiting the store.  

Appellant
and E.T. returned home and pulled into the garage.  The Temples’ garage was
detached from their home and had a door leading into their backyard.  Appellant
testified that he left E.T. in the garage, went into the backyard, and noticed
the back door to the house was open, and the door’s window was broken. 
According to appellant, he immediately grabbed E.T. and took him across the
street to the home of Michael and Peggy Ruggiero.  Appellant banged on the door
and yelled, “Mike, Mike, it’s me, David.  Let me in.”  Michael and Peggy opened
the door, and appellant handed them E.T., told them his house had been
burglarized, and asked them to call 911.  Appellant then ran back to his house
with Michael following.  Appellant entered through the back gate and went into
his house.  Michael stopped at the gate when confronted by Shaka, but saw
appellant enter his house and the back door close behind him.  

Appellant
testified that he went upstairs and found Belinda’s body in the closet of the
master bathroom.  It is undisputed that Belinda was killed by a shotgun blast
to the back of her head.  At 5:38 p.m., appellant called 911.  The 911
dispatcher instructed appellant to perform CPR on Belinda, but he responded, “I
can’t.  Her head is just gone.”

While
Michael was still holding the back gate to prevent Shaka from escaping,
law-enforcement personnel began arriving at the Temple home.  Appellant exited
his house through the back door and announced that Belinda was dead.  He then
placed Shaka in the garage.  

More
law-enforcement personnel arrived, and crime-scene investigators began
processing the scene.  Appellant was placed in the back of a patrol car. 
Kenneth and Maureen later arrived at the scene.  That night, appellant and his
parents were questioned at a local substation by detectives with the Harris
County Sheriff’s Office.  Appellant gave a written statement regarding his and
Belinda’s activities that day.  Detective Charles Leithner questioned appellant
about several apparent inconsistencies in his statement.  Appellant and his
parents were informed that appellant was a suspect in Belinda’s murder.  Early
the next morning, appellant left the substation and went to his parents’ home. 
Appellant and E.T. resided with appellant’s parents until the summer of 2001,
when he remarried.

In 2005,
appellant was indicted for Belinda’s murder.[1] 
In November 2007, a jury found appellant guilty as charged in the indictment
and assessed punishment at life imprisonment.  The trial court denied
appellant’s timely filed motion for new trial.

II.   Sufficiency of the Evidence

In his
first and second issues, appellant argues the evidence is legally and factually
insufficient to support his conviction.  While this appeal was pending, five
judges on the Texas Court of Criminal Appeals held that only one standard
should be used to evaluate whether the evidence is sufficient to support a
criminal conviction beyond a reasonable doubt: legal sufficiency.  See Brooks v. State, ---
S.W.3d ---, 2010 WL 3894613, at *1, *11 (Tex. Crim. App. Oct. 6, 2010)
(plurality op.); id. at *22 (Cochran, J., concurring).  Accordingly, we
will apply the legal-sufficiency standard when addressing appellant’s
legal-sufficiency and factual-sufficiency arguments.  See Pomier v. State,
--- S.W.3d ---, No. 14-09-00247-CR, 2010 WL 4132209, at *2 (Tex. App.—Houston
[14th Dist.] Oct. 21, 2010, no pet. h.) (applying single standard of review
required by Brooks).

A.   Applicable Law
and Standard of Review

A person commits murder if he intentionally or knowingly causes the death of another person or
intends to cause serious bodily injury and commits an act clearly dangerous to
human life that causes the death of another.  Tex. Penal Code Ann. §
19.02(b)(1), (2) (West 2003).  A person acts intentionally with respect to the
nature of his conduct or to a result of his conduct when it is his conscious
objective or desire to engage in the conduct or cause the result.  Id. §
6.03(a) (West 2003).  A person acts knowingly with respect to the nature of his
conduct or to circumstances surrounding his conduct when he is aware of the
nature of his conduct or that the circumstances exist.  Id. § 6.03(b). 
A person also acts knowingly if he is aware his conduct is reasonably certain
to cause the result.  Id.

When
reviewing sufficiency of the evidence, we view all of the evidence in the light
most favorable to the verdict to determine whether the jury was rationally
justified in finding guilt beyond a reasonable doubt.  Brooks, 2010
WL 3894613, at *5 (plurality opinion).  Following the admonitions of the Court
of Criminal Appeals in Brooks, this court may not sit as a thirteenth
juror and substitute its judgment for that of the fact finder by reevaluating the
weight and credibility of the evidence.  Id. at *10, 13; Dewberry v.
State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); see also Sharp v. State,
707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (expressing the jury may choose to
believe or disbelieve any portion of the testimony).  We defer to the fact
finder’s resolution of conflicting evidence unless the resolution is not
rational.  See Clayton v. State, 235 S.W.3d 772 (Tex. Crim. App.
2007).  Our duty as a reviewing court is to ensure that the evidence presented
actually supports a conclusion that the defendant committed the crime. Williams
v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  

Circumstantial
evidence is as probative as direct evidence in establishing the guilt of an
actor, and circumstantial evidence alone can be sufficient to establish guilt. 
Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).  The Court of
Criminal Appeals has affirmed murder convictions based solely on inferences
raised by circumstantial evidence.  See, e.g., Clayton, 235
S.W.3d at 778–82; Guevara v. State, 152 S.W.3d 45, 49–52 (Tex.
Crim. App. 2004); King v. State, 29 S.W.3d 556, 564–65 (Tex.
Crim. App. 2000).  An inference is a conclusion reached by considering other
facts and deducing a logical consequence from them.  Hooper, 214 S.W.3d
at 16.  Speculation is mere theorizing or guessing about the possible meaning
of facts and evidence presented.  Id.  A conclusion reached by
speculation may not be completely unreasonable, but it is not sufficiently
based on facts or evidence to support a finding beyond a reasonable doubt.  Id. 
 Each fact need not point directly and independently to the guilt of the
appellant, as long as the cumulative effect of all the incriminating facts are
sufficient to support the conviction.  Id. at 13.

B.   Analysis

It is
undisputed that sometime after 3:30 p.m. on January 11, 2009, Belinda was shot
in the back of her head at close range by a 12-gauge shotgun loaded with
double-ought buckshot that was likely privately reloaded.  This evidence
inarguably supports a finding that someone intentionally and knowingly caused
Belinda’s death.  We must examine the record to determine whether the evidence,
viewed in the light most favorable to the verdict, is legally and factually sufficient
to support a finding that appellant was the killer.

Appellant
argues that the State’s case against him was premised solely on evidence of
motive and opportunity and not on evidence actually supporting the elements of
murder.  He correctly notes that motive is not an element of any crime.  See
Russo v. State, 228 S.W.3d 779, 794 (Tex. App.—Austin 2007, pet.
ref’d).  However, evidence of motive is generally admissible because it is
relevant as a circumstance tending to prove guilt.  See id.; see also
Clayton, 235 S.W.3d at 778–81; Guevara, 152 S.W.3d at 50; Harris
v. State, 727 S.W.2d 537, 542 (Tex. Crim. App. 1987).

A
substantial portion of the State’s case-in-chief consisted of the prosecutors’
attempt to establish that appellant was a controlling and emotionally abusive
husband who was involved in an extra-marital affair and, thus, had a motive for
killing Belinda.  As noted above, appellant was a football coach and teacher at
Alief Hastings.  He and Belinda were friends with fellow Alief Hastings
football coach Quinton Harlan and his wife, Tammy.  In the Fall of 1998, Alief
Hastings coaches and teachers met every week for a “happy hour.”  Appellant
testified that he attended four or five happy hours.  Quinton testified that he
did not attend many of the happy hours and that appellant would chide him when
he did not attend.  Quinton also testified that when he and appellant did
socialize, appellant would think of stories for Quinton to tell his wife regarding
his whereabouts.  According to Quinton, appellant said he was in control of his
house, and told Quinton that he needed “to take control of [his] house and
control of [his] wife.”  On cross-examination, Quinton explained that appellant
was not joking when he told Quinton to take control of his marriage.  Quinton
also testified that appellant could be volatile, had a controlling personality,
and was meticulous in his planning.  

In 1998,
appellant attended a high school reunion.  According to Quinton, appellant told
him that he met a former girlfriend at the reunion and “[t]hey were on the couch
and they kissed.  And I asked him if he had sex with her and he said, [‘]No,
everything but that.[’]”  Tammy testified that Belinda was uncharacteristically
submissive when she was in appellant’s presence.  Tammy and Quinton testified
that appellant called Belinda “fat” in front of them.  Tammy explained that
appellant made derogatory statements about the manner in which Belinda raised
E.T. and kept the house and also called Belinda’s family “crazy, white trash,
fat” and would say “he didn’t ever want her or [E.T.] around them.” 
Additionally, Brenda Lucas, Belinda’s twin sister, testified that, from her
perspective, appellant was controlling.  She also expressed that during her
last visit to the Temple home, appellant made fun of Belinda’s “big butt.”  This
evidence supports a logical inference that appellant did not respect Belinda.

At the
beginning of the 1998-1999 school year, appellant and Quinton met Heather
Scott, who was teaching English at Alief Hastings.  Both men began a
flirtatious relationship with Heather and occasionally saw her after school. 
Heather knew that appellant and Quinton were married.  Appellant testified that
on two or three occasions, he drove Heather home from a happy hour and kissed
her goodnight.  Appellant testified that he and Heather had sex twice in the Fall
of 1998.  Heather’s roommate, Tara Hall, testified that appellant was
affectionate and polite toward Heather and “seemed to really care about her.” 
Further, appellant bought Heather a gold necklace for Christmas in 1999. 
Quinton and Heather testified that they kissed each other but did not have
sex.  

Quinton
testified that, in November 1998, appellant invited Quinton to appellant’s
house.  When Quinton arrived, appellant entered Quinton’s truck and they drove
around the neighborhood.  According to Quinton, he and appellant discussed
their intentions with Heather.  Appellant asked Quinton if he would leave his
wife for Heather, to which Quinton responded, “No.”  When asked the same
question, appellant responded, “I don’t know.”

In 1998,
Heather invited appellant to a New Year’s Eve party at her townhouse. 
Appellant attended the party and spent two nights with Heather, returning home
January 2, 1999.  Heather testified that she and appellant had sex on January
1; appellant testified he does not remember having sex that day.  As an alibi,
appellant told Belinda he was hunting.  

Heather
initially told police investigators that, on January 5, 1999, she informed
appellant she did not want their “relationship to continue the way it had
been.”  In her second police statement, Heather stated that, on January 8,
1999, appellant told her, “I have totally fallen in love with you.” 
Furthermore, before a grand jury in 1999, Heather testified that appellant told
her he was falling in love with her, and she replied, “I feel the same way . .
. .”  At trial, Heather testified that the police interviewers were extremely
abrasive and coerced her to add this information to her second statement and
phrased it in their own words.  She explained that when appellant told her that
he loved her, it was playfully and “not an I-love-you-ah-ha-big moment.” 
Appellant testified that he never told Heather he loved her.  Detective Tracy
Shipley drafted Heather’s second police statement.  Detective Shipley agreed
that Heather did not want to sign the statement because it included that
appellant had stated he loved her, but that she “eventually got [Heather] to
sign it.”  However, Detective Shipley denied that Heather signed “something she
didn’t want to sign.”  Additionally, Heather testified that for appellant to
use the phrase “I love you” would be significant.

Accordingly,
viewing the foregoing in the light most favorable to the verdict, appellant was
involved in a sexual relationship with Heather, was unsure if he was willing to
leave Belinda for Heather, and told Heather he loved her less than a week
before Belinda’s death.  This evidence, coupled with evidence regarding
appellant’s treatment of Belinda, supports reasonable inferences that appellant
was unhappy with his marriage and had a motive for killing Belinda.  However,
“although evidence of an affair during marriage may
provide a motive, an affair alone
is not enough to connect that person to his or her spouse’s death.”  Smith
v. State, 286 S.W.3d 412, 427 (Tex. App.—Corpus Christi 2008, pet.
struck).  

There
was also evidence supporting an inference that appellant could have been present
when Belinda was murdered.  After appellant arrived home to care for E.T.,
Belinda returned to school for a meeting that lasted until between 3:20 p.m.
and 3:30 p.m.  Phone records indicate that Belinda called home at 3:32 p.m. 
Appellant’s father, Kenneth, testified that Belinda arrived at his home to
retrieve soup Maureen had prepared and left at around 3:45 p.m.  The drive from
appellant’s parents’ home to the Temples’ home ordinarily took around fifteen
minutes.  In his statement to police, appellant indicated that Belinda arrived
home at 3:45 p.m.  At trial, he testified that she arrived home closer to 4:00 p.m. 
Several witnesses testified that Belinda was often tired and had swollen feet
due to her pregnancy.  Appellant testified, “I told Belinda to rest, I would
take [E.T.] to the park and we would be back in time for supper.”  Belinda had
planned to meet with her girlfriends later that evening to play Bunco.  

Appellant
testified he and E.T. drove his truck to nearby Cimarron Park; however, no
evidence corroborates this testimony.  According to appellant, within minutes
of arriving at Cimarron Park, he and E.T. decided to drive to Peckham Park,
located north of I-10.  Appellant testified that he and E.T. then stopped at a
Brookshire Brothers north of I-10 to purchase drinks.  At 4:32 p.m., appellant
and E.T. were videotaped entering Brookshire Brothers.  Hence, at least thirty
minutes elapsed between the time Belinda arrived home and the time appellant
entered Brookshire Brothers.  A detective with the Harris County Sheriff’s
Office testified that, in 1999, it was a twelve-minute drive from appellant’s
home to Brookshire Brothers.  If the jury disbelieved that appellant took E.T.
to Cimarron Park, there were eighteen unaccounted-for minutes between when
Belinda arrived home and appellant entered Brookshire Brothers.  According to
the medical examiner and appellant’s medical expert, there were too many
unknown variables to determine the time of Belinda’s death.  The only certainty
is that she was killed sometime after her school meeting ended between 3:20 and
3:30 p.m.

Notably,
appellant presented evidence that a gun was fired in his neighborhood at a time
when he was videotaped at Brookshire Brothers.   In January 1999, Alexander
Roberts had three sons in elementary school.  The Roberts family shared a back
fence with appellant.  On January 11, the Roberts brothers arrived home from
school at around 3:57 p.m.  According to the eldest brother, fifteen minutes
after arriving home, they began watching a movie.  Twenty–six minutes into the
movie, the brothers heard what they believed was a gunshot.  According to their
testimony, the time of the gunshot was around 4:38 p.m.—the same time that
appellant was videotaped leaving Brookshire Brothers.  Although the Roberts
brothers’ testimony supported appellant’s defense, the jury was free to
disbelieve it and rationally could have done so because the Roberts brothers
were children and no other witness testified that a gunshot was heard that
day.  Accordingly, viewing the evidence in the light most favorable to the
verdict, we conclude the evidence supports a reasonable inference that
appellant could have been in his home when Belinda was murdered.

Evidence
impeaching appellant’s stated purpose for driving north of I-10 on the
afternoon of Belinda’s death was also a circumstance of his guilt.  Appellant
maintained that, after leaving Brookshire Brothers, he drove directly to Home
Depot to look at shelving for the baby’s room.  Appellant testified he drove
eastward toward Home Depot.  Notwithstanding appellant’s testimony that traffic
was congested that afternoon, several witnesses testified that the drive time
from Brookshire Brothers to Home Depot was ten to fifteen minutes.  Appellant
and E.T. were videotaped leaving Brookshire Brothers at 4:38 and videotaped
entering Home Depot at 5:14 p.m.  Thus, there was a thirty-six-minute gap
between when appellant left the Brookshire Brothers and entered Home Depot. 
More significantly, Bernard Bindeman testified that between 4:50 and 5:00 p.m.,
he was in his truck stopped at the intersection of Morton Ranch Road (running
east and west) and Katy Hockley Cutoff (running north and south) when he saw
appellant in a blue pickup truck heading south on Katy Hockley Cutoff. 
Appellant was heading from a location near to where his parents and other
relatives lived and where he was raised.  This evidence, viewed in the light
most favorable to the verdict, supports a reasonable inference that appellant
lied to police concerning his purpose for driving north of I-10.  Lying to
police is a circumstance of guilt.  See Guevara, 152 S.W.3d at 50.

There was
also evidence supporting an inference that appellant lied when he said he
placed E.T. in a car seat before they drove north of I-10.  Detective Holtke
testified there was no child seat in appellant’s truck when he processed it. 
Photographs taken of appellant’s truck did not show a car seat.  When asked at
trial where the car seat was, appellant testified, “I have no idea.”  Appellant
testified he always placed E.T. in his car seat when they drove together, and
Quinton and Tammy testified that they never saw appellant put E.T. in his truck
without using a car seat.  Evidence that appellant always used a car seat, but
did not on the day of Belinda’s murder, supports a reasonable inference that
appellant was in a hurry to drive away from his house.

Another circumstance
of guilt was testimony and physical evidence that appellant’s house was
“staged” to give the impression a burglary occurred.  Appellant testified that
he noticed the window on his back door had been broken when he returned from
Home Depot.  The television in appellant’s living room was lying sideways on
the ground, and a buffet in the dining room had several drawers open.  Further,
appellant’s mother later determined that several pieces of Belinda’s jewelry
were missing, including two necklaces, two watches, and three sets of
earrings.  Accordingly, appellant argued his house was burglarized sometime
while he was at the park and stores.  However, Sergeant Dean Holtke, who was an
investigator with the Harris County Sheriff’s Office at the time of the murder,
testified that the burglary appeared to have been staged.

The back
door of appellant’s house opened to a small foyer.  Directly beyond the foyer
was a couch, and to the left of the foyer was a living room.  A wooden hutch
was against the wall directly to the left of the door.  Officers found
considerably more glass shards in the living room than in the foyer area and
found none on the couch.  Sergeant Holtke testified this finding was consistent
with the door being open when the glass was broken.  Detectives also did not
see damage to the hutch or dents on the inside of the back door, which tended
to discredit appellant’s theory that glass was thrown into the living room when
the back door slammed into the hutch.[2] 
Sergeant Holtke opined that the television was dragged off its stand and placed
carefully on the ground because the stand had fresh scrapes and the television
was still plugged into the wall.  The contents of the open drawers were
undisturbed, and appellant’s jewelry was found on a tray in the master bedroom
in plain view.  Appellant agreed that, to the best of his knowledge, the
burglar “didn’t take one single thing that belonged to [him].”  Additionally,
the jewelry Belinda was wearing was not taken.  Finally, the location and
timing of the alleged burglary were suspicious: the Temples lived in a corner
home, and the burglary allegedly occurred during the day at a time when persons
typically return home from work and school.  See Routier v. State, 273
S.W.3d 241, 258 (Tex. Crim. App. 2008) (including in list of factors
supporting “staging” that defendant’s “house would not have been an inviting
target for a home invader”).  Accordingly, viewing the evidence in the light
most favorable to the verdict, the jury could have concluded that the burglary
was staged and, thus, believed that Belinda’s missing jewelry was not the
result of a burglary.[3]

Next,
evidence of appellant’s behavior following Belinda’s murder, when viewed in the
light most favorable to the verdict, supports an inference of guilt.  See
Guevara, 152 S.W.3d at 50; Hinojosa v. State, 4 S.W.3d 240,
253 (Tex. Crim. App. 1999) (relying on defendant’s suspicious behavior
following murder as a circumstance of guilt).  First, law-enforcement personnel
commented on appellant’s lack of emotion on the day of the murder.  Deputy
Virginia Kathleen Johnson and her partner were the first law-enforcement
personnel to arrive at appellant’s house.  According to Deputy Johnson, while
she and her partner were standing outside the gate to appellant’s backyard,
appellant exited through the back door of his house and said calmly, “My wife
has been shot.  She’s dead.”  Deputy Johnson further testified that appellant
did not appear to be upset and she did not see him cry.  Detective Charles
Leithner testified that, when he interviewed appellant later that evening, appellant
was “shaking and bouncing,” did not look the detective in the eyes, never
cried, and was hesitant in his answers.  Additionally, Quinton testified that,
a few weeks after Belinda’s funeral, he asked appellant if he would like to
find the murderer, to which appellant responded, “[W]hat difference is it going
to make.  It’s not going to bring her back.”   

Second,
appellant resumed his relationship with Heather shortly after Belinda’s
murder.  On January 13, appellant’s parents hosted a visitation at their
house.  Quinton and Tammy attended the reception.  Quinton testified that, when
he and appellant were alone, the first thing appellant asked was, “How’s
Heather?” and “Is she doing okay?  How is she holding up?  Has she said
anything?”  Quinton testified that appellant later called him and apologized
that he and Heather had to “go through this” and asked him to tell Heather he
was sorry.  Heather testified she received flowers from appellant on
Valentine’s Day—a month after Belinda’s murder.  Tara also testified that
appellant visited Heather several times that spring and he and Heather planted
flowers on the patio.  Appellant’s neighbor, Natalie Scott, testified that she saw
appellant at a steakhouse in September 1999 and he had his arm around a “thin,
blonde-haired woman . . . in a red dress.”  Natalie explained that she
attempted to talk to appellant, but he looked away.  Kenneth testified he
learned six months after Belinda’s death that appellant was dating Heather. 
Kevin and his wife testified that they were very upset when they learned
appellant was dating Heather and did not speak to him for several months. 
Appellant and Heather married in June 2001.

Third,
appellant confronted Quinton and Tammy regarding their statements to the police
and to a grand jury in April 1999.  After testifying before the grand jury,
they received a telephone call from appellant.  When Tammy answered, appellant
asked her what she had told the grand jury.  Tammy responded, “We’re not
supposed to talk about this.”  When appellant posed the same question to
Quinton, he responded, “I told the truth.”  Later, appellant asked Quinton what
he was telling the grand jury and the police.  When Quinton answered, “I’m just
telling them the truth,” appellant replied, “You know, you need to keep your
mouth shut.”  Afterwards, Quinton was driving on I-10 when he noticed appellant
following him.  When they came to a stop, appellant exited his truck, approached
Quinton, and asked, “What are you saying to the police?”  Again, Quinton
responded, “I’m just telling the truth,” and appellant ordered, “You keep your
damn mouth shut.”  Similarly, appellant followed Tammy one evening when she was
driving to her place of business.  When Tammy noticed appellant, she sped to
the business, grabbed her gun, and ran inside.  Appellant pulled in front of
the business but did not stop.  These three examples of appellant’s behavior
following Belinda’s death are circumstances indicating guilt.

Appellant
argues that no evidence supports a finding that he ever owned a 12-gauge shotgun,
owned a reloader or reloaded double-ought shotgun shells, or handled a weapon
on the day of the shooting.  At trial, appellant and his family testified
regarding the shotguns they owned during the 1980s.  They were adamant Darren
and Kevin owned 12-gauge shotguns but appellant owned only a 20-gauge shotgun. 
Kevin testified that in 1983 or 1984, the barrel on appellant’s 20-gauge became
clogged and split when it was fired, injuring appellant.  Kevin testified that
he later sawed off the split barrel and eventually discarded the gun.

Clint
Stockdick was Kevin’s best friend during the 1980s.  He testified that he began
hunting with the Temples in 1984 or 1985, frequently hunted with Kevin, and
hunted with appellant “[j]ust a couple of times.”  Clint testified that he
never saw the Temples use 20-gauge shells, both Kevin and appellant used
12-gauge shotguns, Clint never saw either of them shoot a 20-gauge shotgun, and
Kevin showed Clint a 12-gauge shotgun with a split barrel.  Additionally, Clint
testified that the gun he saw Kevin use most frequently was a Mossberg 12-gauge
shotgun; Kevin, however, testified that the Temples never owned a Mossberg
shotgun.  Although this evidence did not tie appellant to a specific murder
weapon, when viewed in the light most favorable to the verdict, it supported an
inference appellant and his family were concealing information concerning their
shotguns.  Concealing incriminating evidence is a circumstance of guilt.  See,
e.g., Wells v. State, 578 S.W.2d 118, 119 (Tex. Crim. App.
1979); Tezino v. State, 765 S.W.2d 482, 485 (Tex. App.—Houston [1st
Dist.] 1988, pet. ref’d).  Furthermore, although no evidence supported a finding
that any member of the Temple family used double-ought buckshot or reloaded his
own shotgun shells, the State need not connect appellant to a specific murder
weapon or ammunition; a conviction may be based entirely on circumstantial
evidence.  See Hooper, 214 S.W.3d at 13.

            In sum,
viewing the evidence in the light most favorable to the verdict, we conclude
the evidence is legally and factually sufficient to support beyond a reasonable
doubt that appellant murdered Belinda.  See Brooks, 2010 WL 3894613,
at *5 (plurality op.).  The evidence supports a finding that appellant had
motive and opportunity to murder Belinda, lied about the reason he was driving
north of I-10 on the afternoon of the murder and about placing E.T. in a car
seat, had a questionable demeanor immediately following Belinda’s death,
quickly resumed his relationship with Heather following Belinda’s death,
confronted Quinton and Tammy regarding their statements to police and the grand
jury, appellant’s house was “staged” to appear as if a burglary had occurred,
and appellant and his family were untruthful regarding their shotguns.  “While each piece of evidence
lacked strength in isolation, the consistency of the evidence and the
reasonable inferences drawn therefrom, provide the girders to strengthen the
evidence and support a rational jury’s finding the elements beyond a reasonable
doubt.”  Swearingen v. State, 101 S.W.3d 89, 97 (Tex. Crim. App.
2003).  Accordingly, we overrule appellant’s first and second issues. 

III.   Alleged Brady Violation

In his
third issue, appellant contends his due-process rights under Brady v.
Maryland, 373 U.S. 83 (1963), were violated because the State did not
disclose exculpatory evidence regarding his next-door neighbor, teenager
R.J.S., until after trial had begun.  Additionally, in issue four, appellant
contends the trial court erred by denying his motion for continuance in which
he sought a reasonable time to utilize the untimely disclosed Brady
material.

A Brady
complaint must be made as soon as its grounds become apparent or should be
apparent.  See Wilson v. State, 7 S.W.3d 136, 146 (Tex. Crim.
App. 1999); see also Tex. R. App. P. 33.1(a)(1).

Appellant
asserted that he first learned of the undisclosed evidence regarding R.J.S. on
October 22, 2007, a week into trial, when Detective Leithner testified and
appellant was first allowed to review Detective Leithner’s police report. 
However, appellant waited twenty-one days to file a motion for continuance—after
the State rested and appellant had presented evidence for four days.  We hold
that appellant did not complain regarding the State’s untimely disclosure as
soon as grounds for an objection or complaint were apparent.  Consequently,
appellant did not preserve his Brady complaint.  See Wilson, 7
S.W.3d at 146.

Nevertheless,
even assuming appellant preserved his Brady complaint, we conclude he
has not established reversible error.  Under Brady, a defendant must
show (1) the State failed to disclose evidence, regardless of the prosecution’s
good or bad faith, (2) the withheld evidence is favorable to the defendant, and
(3) the evidence is material, i.e., there is a reasonable probability had the
evidence been disclosed, the outcome of the trial would have been different.  Hampton
v. State, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002).  The
defendant bears the burden of showing that, in light of all the evidence, it is
reasonably probable the outcome of the trial would have been different had the
prosecutor made a timely disclosure.  Id.  The mere possibility that an
item of undisclosed information might have helped the defense or affected the
outcome of the trial does not establish materiality in the constitutional
sense.  Id.  

In January 1999, R.J.S. was a high school student who
lived with his parents next door to the Temples.  In his motion for
continuance, appellant complained that the State failed to timely disclose the
following facts: (1) R.J.S. lied about skipping school on the day Belinda was murdered;
(2) R.J.S. gave three conflicting statements to the police and failed three
polygraphs; (3) R.J.S. and his friends were in appellant’s neighborhood around
the time of the murder, had smoked marijuana that afternoon, and were looking
for more marijuana; (4) R.J.S. saw appellant driving in the neighborhood
sometime before 4:30; and (5) a 12-gauge shotgun containing a spent
double-ought buckshot shell and belonging to R.J.S.’s father was found after
the murder.  With the exception of R.J.S.’s polygraph failures, the remainder
of these facts were presented to the jury.  During redirect-examination,
defense counsel asked appellant whether he believed R.J.S. could have been
involved in Belinda’s murder.  Through a methodical series of questions
emphasizing the above facts, appellant answered affirmatively.  The State
called R.J.S. as its sole rebuttal witness, and appellant thoroughly
cross-examined him regarding these facts.  Further, during closing argument, appellant
focused on R.J.S.’s alleged participation.  Therefore, the jury considered the
aforementioned untimely disclosed facts.  Considering the heavy emphasis he
placed on R.J.S. during trial, appellant has not established that there is a
reasonable probability the outcome of the trial would have been different had
the State disclosed these facts earlier.  See Shpikula v. State, 68
S.W.3d 212, 220 (Tex. App.—Houston [1st Dist.] 2002, pet. ref’d) (“If the
defendant received the material in time to put it
to effective use at trial, his conviction should not be
reversed simply because it was not disclosed as early as it might or should
have been.”).  Accordingly, we overrule appellant’s third and fourth issues.

IV.   Evidentiary and Jury-Argument Rulings

            Appellant
presents seventy-five issues in which he complains about the trial court’s
rulings and the prosecutors’ alleged misconduct during the evidentiary and
jury-argument phases of trial.  We first determine whether the court’s rulings
were erroneous.  We then determine the cumulative effect of any errors on the
jury’s verdict.  We begin with those issues pertaining to admission of
evidence.

A.   Evidentiary
Rulings

We
review a trial court’s decision to admit evidence under an abuse-of-discretion
standard.  Shuffield v. State, 189 S.W.3d 782, 793 (Tex. Crim. App.
2006).  Under this standard, if the trial court’s ruling was within the zone of
reasonable disagreement, we will not disturb the ruling.  Bigon v. State,
252 S.W.3d 360, 367 (Tex. Crim. App. 2008).

To
preserve error for appellate review, a defendant must timely
object to the error during trial.  See Tex. R.
App. P. 33.1(a).  If the objection is overruled, the defendant has preserved
error.  When the objection is sustained, and the defendant desires to preserve argument
that the error incurably infected his right to a fair trial, he should request
an instruction to disregard and move for a mistrial.  See Jackson v. State, 287
S.W.3d 346, 353–54 (Tex. App.—Houston [14th Dist.] 2009, no pet.).  Failure
to request additional relief after an objection is sustained preserves nothing
for review.  See Caron v. State, 162 S.W.3d 614, 617 (Tex. App.—Houston
[14th Dist.] 2005, no pet.).

Several
issues pertain to the prosecutor’s cross-examination of appellant.  The parameters
of cross-examination are within the trial court’s discretion, and its decision
is not subject to reversal on appeal absent a clear abuse of discretion.  Chambers
v. State, 866 S.W.2d 9, 27 (Tex. Crim. App. 1993).  A defendant who
exercises his right to testify is subject to the same rules governing
examination and cross-examination as any other witness.  Felder v. State,
848 S.W.2d 85, 99 (Tex. Crim. App. 1992).  The scope of cross-examination is
wide open, and once the defendant testifies at trial, he opens himself up to
questioning by the prosecutor on any subject matter that is relevant.  Caron,
162 S.W.3d at 617.

1.   Questions
Regarding Witness Veracity

            In issues
five, seven, nine, eleven, and thirteen, appellant contends the trial court
erred by allowing the prosecutor to question appellant regarding the veracity
of other witnesses’ testimony.[4] 
We first describe the testimony about which appellant was asked to comment.

Tammy
testified she heard appellant call Belinda “fat,” criticize her clothing, house
work, and how she raised E.T, and express that her family was “crazy, white
trash, fat, and . . . he didn’t ever want her or [E.T.] around them.”  Quinton
testified he heard appellant call Belinda fat and that appellant told him
Belinda used to be an aerobics instructor and “looked good” but “[n]ow she’s
fat.”  Tammy also testified she witnessed between twenty and thirty times Belinda’s
routine when returning home and that Belinda would remove her shoes when she
arrived home.

Brenda
Lucas visited the Temples from December 27, 1998, until January 1, 1999. 
Brenda testified that appellant “was making fun of Belinda’s big butt” during
the first evening of the visit.  On December 30, Brenda and Belinda celebrated
their thirtieth birthday.  Brenda testified she did not see appellant give
Belinda a birthday gift.  Brenda further testified that, during her visits to
the Temples’ home, she observed Belinda remove her shoes when she arrived
home.  

Appellant
vehemently denied ever calling Belinda “fat” or making derogatory statements
about her family.  Appellant explained that he and Belinda jokingly referred to
her “butt,” but “for no stretch of the imagination would I ever seriously call
my wife fat ever, without a doubt.”  He testified that he gave Belinda perfume
and pajamas for her birthday, as well as gifts for Christmas and their
anniversary.  Finally, he testified that Belinda did not take her shoes off
when she arrived home.

On the
first day of appellant’s cross-examination, the prosecutor asked appellant
whether Tammy “just made all that up” regarding his ridiculing Belinda’s
weight.  The trial court overruled appellant’s objection to the form of the
question, and appellant answered, “I know she made it up.”  Cross-examination
continued the next day, and the following exchanges occurred:

[Prosecutor:]  
So did Brenda try to mislead this jury when she told them that she never saw
you give her sister a birthday present?

[Defense
Counsel:]   Object to the form of the question.

[Court:]  
That’s sustained.

[Prosecutor:]  
Did Brenda lie?

[Defense
Counsel:]   And I object to the form of the question.

[Court:]  
That’s overruled.

[Defense
Counsel:]   It’s asking one witness to comment on . . . the truth of the
testimony of another.

[Court:]  
That’s overruled.

[Prosecutor:]  
Mr. Temple, did Brenda lie?

[Appellant:]  
Yes ma’am, she did.

. . . .

[Prosecutor:]  
Well, do you recall Quinton Harlan telling the truth and admitting to this jury
that he went over to Heather’s house and kissed her?  

[Defense
Counsel:]   I object to the form of the question, telling the truth and
admitting to something.

[Court:]  
That’s sustained.

[Prosecutor:]  
Do you remember Quinton Harlan telling this jury that he went over to Heather’s
house and kissed her?

[Appellant:]  
I remember that, and Quinton told me that himself.  I knew that.

[Prosecutor:]  
And so he told the truth?

[Defense
Counsel:]   I object to the form of the question.

[Court:]  
That’s overruled.

[Appellant:]  
On that statement, yes, ma’am.

[Prosecutor:]  
Are you saying he lied on other ones, Mr. Temple?

[Defense
Counsel:]  I object to asking the witness to use the term “lied.”  There are
many reasons for incorrect testimony.

[Court:]  
That’s overruled.

[Prosecutor:]  
Are you saying that Quinton Harlan lied on anything, Mr. Temple?

[Appellant:]  
If you could ask me single-by-single, I could tell you which ones are truth and
which ones are not.  Him kissing Heather, I know for a fact that that happened
and he told me about it himself.

. . . .

[Prosecutor:]  
And the things that Tammy Harlan told this jury the names that you used to call
your wife, making fun of her weight, making fun of how she looked, those things
were the truth, weren’t they?

[Appellant:]  
They were not.  I answered that question yesterday.

[Prosecutor:]  
So Tammy Harlan lied about that?

[Defense
counsel:]   I object to terming it a lie.

[Court:]  
That’s overruled.

[Appellant:]  
Tammy and Quinton both lied several times.

[Prosecutor:]  
So we’ve got Tammy lying, Quinton lying, Brenda Lucas lying, right?

[Appellant:]  
I would agree with that, yes.

. . . .

[Prosecutor:]  
And you had a wife who liked to take her shoes off the minute she hit the door
anyway, didn’t you?

[Appellant:]  
I would not agree with that.

[Prosecutor:]  
So when Brenda Lucas and Tammy Harlan said that, they lied about that, too?

[Defense
counsel:]   Excuse me.  I object to the form of the question.

[Court:]  
And that’s overruled.

[Appellant:]  
I don’t know if that’s what they think they saw . . . .  I’m not calling them a
liar about that.  I know and spent every day with my wife.  I know that when
she came in the door, she would not flip her shoes off.

It is
well-settled that an attorney may not impeach one witness’s testimony with the
testimony of other witnesses.  See Lopez v. State, 200 S.W.3d 246,
257 (Tex. App.—Houston [14 Dist.] 2006, pet. ref’d) (citing Ex parte
McFarland, 163 S.W.3d 743, 755 n.37 (Tex. Crim. App. 2005)).  Thus, we hold
that the trial court erred by overruling appellant’s objection to the prosecutor’s
veracity questions and will consider this error in our harm analysis.

2.  
Appellant’s
Cross-Examination

            In issues
fifteen through twenty-four, appellant contends the State asked him irrelevant
and inflammatory questions in an attempt to demonize him in front of the jury. 
Appellant argues that these questions abrogated his right to a fair trial.

            During
cross-examination, the prosecutor asked appellant whether the reason the
Harlans “stopped being you all’s best friends was because Tammy Harlan got
tired of the way you were treating Belinda?”  The prosecutor also asked
appellant how the second night of his high school reunion could have been a
“wonderful night” when Tammy “had to tell Belinda afterwards ‘It’s okay,
Belinda.  You’re a beautiful girl.  Don’t let all that bother you.’”  The trial
court sustained appellant’s objection to these questions, but appellant did not
request an instruction to disregard or move for a mistrial.  Thus, the trial
court committed no error because it granted appellant all the relief he
requested.  See Young, 137 S.W.3d at 69.  We overrule appellant’s
fifteenth and sixteenth issues.

In
issues seventeen and eighteen, appellant complains about the prosecutor’s
questions regarding his unborn daughter.  On direct-examination, appellant
testified that he loved his unborn daughter and “wanted her more than
anything.”  On cross-examination, the prosecutor asked appellant whether he and
Belinda argued regarding his not wanting a daughter.

[Prosecutor:]  
And you all had many, many arguments about the fact that you didn’t want a baby
daughter, didn’t you, Mr. Temple?

[Defense
counsel:]   That’s a lie and I object to it and it’s improper.  There’s no
evidence to support that.

[Court:]  
That’s sustained.

[Prosecutor:]  
Didn’t you have arguments about that, Mr. Temple?

[Appellant:]  
Absolutely not.

[Prosecutor:]  
Didn’t you argue about the fact that you were not excited about the idea of a
baby daughter when Brenda Lucas was visiting at your house?

[Defense
counsel:]   This is improper cross-examination, injecting facts.

[Court:]  
That’s overruled.

[Appellant:]  
I never argued with my wife about not wanting my daughter.  It was planned from
the very beginning and the first day.

Appellant
did not request that the jury be instructed to disregard the prosecutor’s
initial question after the trial court sustained his objection and did not
object when the prosecutor ignored the court’s ruling.  However, appellant
preserved his complaint regarding the prosecutor’s question concerning
appellant’s argument with Belinda when Brenda was visiting.

“[T]he
prosecution cannot attempt to establish a theory of appellant’s action by
questions alone, with no basis of fact.”  Hartman v. State, 507
S.W.2d 553, 556 (Tex. Crim. App. 1974); see also Keener v. State, 164
Tex. Crim. 439, 442, 300 S.W.2d 85, 87 (1957) (“[U]nless the questions are
propounded in good faith, the attorneys for the State should refrain from
attempting to establish their theory by [questions] alone.”).  Prior to
appellant’s testimony, no evidence had been presented indicating that appellant
did not want his daughter.  Nevertheless, the trial court had informed the
parties: “I’m going to assume both of you lawyers are asking your questions in
good faith until someone tells me otherwise.”  During the hearing on
appellant’s motion for new trial, defense counsel questioned the prosecutor
regarding her basis for these questions.[5] 
The prosecutor testified that she received information from members of the
Temple family and Belinda’s girlfriends that the Temples argued about their
unborn daughter; the prosecutor was not asked whether Brenda was included in
this group.  Consequently, we cannot discern from the record whether the
prosecutor asked the subject question without a basis in fact.  See Hartman, 507
S.W.2d at 556; Keener, 300 S.W.2d at 87.[6] 
We also note that appellant opened the door by testifying on direct-examination
that he wanted his daughter “more than anything.”  Accordingly, we overrule
appellant’s seventeenth and eighteenth issues.

            

In issue
twenty,[7]
appellant complains about the following question:

[Prosecutor:]  
[Y]ou didn’t give a flip about the Lucases, did you?

[Defense
counsel:]   I object to the form of the question and injecting unsworn
testimony from the prosecutor.

[Court:]  
That’s overruled.

After
the objection was overruled, appellant did not answer, and the prosecutor posed
a different question.  There was testimony that appellant called Belinda’s
family (the Lucases) “crazy, white trash, fat, and . . . he didn’t ever want
her or [E.T.] around them.”  Thus, there was an evidentiary basis for this
question.  Furthermore, whether the form of this question was actually
argumentative may have turned on the prosecutor’s tone and demeanor when she
asked it.  Nevertheless, we will assume arguendo that the question was
argumentative and consider its effects in our harm analysis. 

In his
twentieth and twenty-first issues, appellant complains that the following
exchange abrogated his right to a fair trial, necessitating a mistrial:

[Prosecutor:]  
Who have you ever told that Shaka was in the garage and that’s how the burglar
got past him?

[Defense
counsel:]   Is she asking what he said to me.  I want to know what she’s trying
to --

[Court:]  
That’s overruled.

[Prosecutor:]  
Mr. Temple, you just said you have.  Well, who have you told?

[Appellant:]  
I’ve told [Defense counsel].  It was not something that was dreamed up.

[Prosecutor:]  
No, it’s just lied about.

[Defense
counsel:]   Excuse me.  Now that’s -- Judge, you’ve got to stop that kind of
stuff.

[Court:]  
Members of the jury, remember your admonitions.  Step to your jury room for a
moment, please.

(Outside
presence of the jury)

[Court:]  
All right.  Everyone be seated.  [Prosecutor], that last question was uncalled
for.  We cannot have that type of conduct.

[Prosecutor:]  
Yes, sir.  Could you please instruct the witness to answer my questions.

[Court:]  
I will do that also.

[Defense
counsel:]   Now --

[Court:]  
Now just a minute, [Defense counsel].  Mr. Temple, I want you to listen to the
questions that each lawyer asks you, answer the question, answer it directly. 
Most of them can be answered yes or no.  You don’t volunteer any additional
information, but listen to the questions and answer them.  Now, [Defense counsel].

[Defense
counsel:]  Judge, that last question by [Prosecutor] cannot be attributed to
lack of experience, it can’t be attributed to ignorance, it can’t be attributed
to negligence.  She is one of the finest prosecutors in the state, and that was
calculated, it’s improper, it goes beyond the record, it is highly
inflammatory, and we object to it.

[Court:]  
Well, your objection was sustained, and I will certainly admonish the jury that
they can’t consider it in any way.  

[Defense
counsel:]   Yes, sir. And I don’t think any admonishment -- with all due
respect, I don’t think any admonishment can cure the harm.  What we have is a
prosecutor, who holds the office of assistant district attorney, making a
statement about a lie in front of this jury.  Now, the jury may put far more
weight on that than it is due, far more than it deserves.  It deserves
absolutely no weight at all. She can holler and scream in argument, but it is
improper and clearly improper and she knows better to do that in a cross-examination;
and, therefore, we move for a mistrial.

[Court:]  
Okay.  And that’s denied, sir.

[Defense
counsel:]   Do I need to do all that in front of the jury?

[Court:]  
No. The record has you exactly -- your motion, and it can go up on appeal on
that issue.  Bring me the jury and I will admonish them to totally disregard.

(Jury
seated)

[Court:]  
All right.  Everyone be seated.  Members of the jury, the last question by [the
prosecutor] you will totally disregard and not consider it for any purpose
whatsoever.

(emphasis added).  

Accordingly,
the prosecutor accused appellant of being a liar, not indirectly through a question,
but as a matter-of-fact assertion.  This action was clearly prosecutorial
misconduct.  See Stein v. State, 492 S.W.2d 548,
551 (Tex. Crim. App. 1973) (explaining prosecutors should not make improper
arguments or sidebar remarks because defendant should be convicted upon
evidence presented, without attempts to inflame or prejudice the minds of the
jurors).  The trial court sustained appellant’s objection and instructed the
jury to disregard the comment, but denied appellant’s request for a mistrial. 
We will consider in our harm analysis whether the court erred by denying
mistrial.  

Appellant
testified that, on January 13, 1999, he and his father and brothers convened a
family meeting at appellant’s parents’ house, during which appellant informed
his family that he had been unfaithful to Belinda.  In his twenty-third issue,
appellant complains that the following questions were without factual basis:

 [Prosecutor:]  
[W]as the real discussion in the family meeting about all those shotguns, Mr.
Temple?

[Defense
counsel:]   You know, that’s bad faith.  There’s no --

[Court:]  
That’s overruled.

[Defense
counsel:]   We object to it.  It’s injecting unsworn testimony from the
prosecutor.

[Prosecutor:]  
Judge, that’s a speaking objection.

[Court:]  
That’s overruled.

[Prosecutor:]  
We’ve got a Winchester, a Mossberg, a Savage and a Remington.  In your family
meeting that you had with your brothers, with the Temple men, on January the
13th, did you all talk about those shotguns?

[Appellant:]  
Absolutely not.  There was no reason to.

[Prosecutor:]  
Did you all talk about the sawed-off shotgun?

[Appellant:]  
There’s -- no.

 

Prior to
these questions, nothing in the record reflected that the Temple men discussed
shotguns at their January 13, 1999 meeting.  Instead, all evidence indicated
the subject matter of the meeting concerned appellant’s unfaithfulness to
Belinda.  However, appellant has not established that the questions were asked
in bad faith without factual basis.  At the time the questions were posed, he
did not request to take the prosecutor on voir dire.  Further, at the
motion-for-new-trial hearing, the prosecutor was not asked if she had a factual
basis for making this inquiry.  Hence, we cannot determine from the record
whether the prosecutor asked the question in bad faith without a basis in
fact.  See Keener, 300 S.W.2d at 87; Gailey, 671 S.W.2d
at 124.  We overrule appellant’s twenty-third issue.

In issue
twenty-four, appellant argues the trial court erred by denying his motion for
mistrial after the prosecutor expressed that appellant’s entire family stopped
speaking with him after the murder.  Kevin and Rebecca “Becky” Temple testified
that there was a period following Belinda’s murder when they did not speak with
appellant.  Later, the prosecutor posed the following question to appellant:

[Prosecutor:]  
Why did your own family quit speaking to you?

[Defense
counsel:]   Now, wait a minute.

[Court:]  
That’s sustained.

[Prosecutor:]  
You heard --

[Defense
counsel:]   Please, Judge, please control her.

[Prosecutor:]  
Judge--

[Court:]  
Members of the jury, remember your admonitions.  Step to your jury room for a
moment.

(Outside
presence of the jury)

[Court:]  
[Prosecutor], you’re going to have to refrain from continuing to ask legally
objectionable questions.  You can ask that question, did you and your family
stop speaking, and then go into the why, but you’re interjecting things into
the case that just aren’t in evidence.  

[Prosecutor:]  
Judge, Becky Temple testified that there came a time where she and her husband
quit speaking to the defendant and Heather.  That’s in evidence.

[Court:]  
Your question was the family.  If you want to talk about Becky Temple, you can
do that, but your question said the family.

[Prosecutor:]  
Yes, sir.

[Court:]  
Bring me a jury.

[Defense
counsel:]   I ask that the jury be instructed to disregard.

[Court:]  
I will.

[Defense
counsel:]   And because it was deliberate, we ask for a mistrial.

[Court:]  
That’s denied.  Bring me a jury, please.

(Jury
seated)

[Court:]:  
Members of the jury, you will totally disregard the last question of the
prosecutor and not consider it for any purpose whatsoever.

Thus,
the trial court sustained appellant’s objection to the prosecutor’s overly
broad reference to his entire family, instructed the jury to disregard the
question, but denied appellant’s motion for mistrial.  We conclude the
foregoing question was not so “clearly calculated to inflame the minds of the
jury” that the instruction to disregard was futile.  Huffman v. State, 746
S.W.2d 212, 219 (Tex. Crim. App. 1988) (quoting Carter v. State,
614 S.W.2d 821, 824–25 (Tex. Crim. App. 1981)).  Although the prosecutor referred
to matters outside the record when she asked appellant why his entire family,
instead of just Kevin and Rebecca, stopped speaking to him following Belinda’s
murder, the error was quickly remedied by the court’s instruction to disregard
and we presume the jury followed the instruction.  See Colburn v. State,
966 S.W.2d 511, 520 (Tex. Crim. App. 1998).  Thus, we conclude the trial court
did not abuse its discretion by denying appellant’s motion for mistrial.  See
Archie v. State, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).  We overrule
appellant’s twenty-fourth issue.

3.  
Hearsay-by-Inference Contentions

            We next
consider issues sixty-eight through eighty, in which appellant contends the
trial court erred by overruling his objections to certain “back-door” hearsay.[8]

“[W]here
there is an inescapable conclusion that a piece of evidence is being offered to
prove statements made outside the courtroom, a party may not circumvent the
hearsay prohibition through artful questioning designed to elicit hearsay
indirectly.”  Schaffer v. State, 777 S.W.2d 111, 114 (Tex.
Crim. App. 1989).  Whether the disputed testimony violates the hearsay
prohibition necessarily turns on how strongly the content of the out-of-court
statement can be inferred from context.  Head v. State, 4 S.W.3d
258, 261–62 (Tex. Crim. App. 1999).

            In his
sixty-ninth and seventy-first issues, appellant argues the trial court erred by
allowing Detective Leithner to testify regarding statements made by Heather
Scott.

[Prosecutor:]  
When you were interviewing Heather Scott the day you took her first statement,
did she have any other concerns about all of this that she voiced to you?  Yes
or no?

[Defense
counsel:]   Excuse me.  This calls for hearsay.

[Court:]  
That’s overruled.

[Sgt.
Leithner:]   Yes.

[Prosecutor:]  
Did you try to reassure her?

[Sgt.
Leithner:]   Yes.

[Prosecutor:]  
What did you tell Heather Scott?

[Defense
counsel:]   Well, that’s hearsay by implication.

[Court:]  
That’s overruled.

[Sgt.
Leithner:]   I told her that we were not going to disclose this information
with her employers.

[Prosecutor:]  
With who?

[Sgt.
Leithner:]   Her employers.

[Prosecutor:]  
At the school?

[Sgt.
Leithner:]   Yes, ma’am.

[Prosecutor:]  
Because she worked there?

[Sgt.
Leithner:]   Because she worked at the same school that Coach Temple did.

 

Assuming
the trial court erred by overruling appellant’s objection, we conclude that
this testimony did not substantially affect the jury’s verdict; notwithstanding
the accusations against appellant, the jury could have determined there were
other obvious reasons why Heather would not want her employers to learn about
her extra-marital relationship with appellant.  Thus, we overrule appellant’s
sixty-ninth and seventy-first issues.

In his
seventy-third issue, appellant complains about Tammy Harlan’s testimony:

[Prosecutor:]  
Did you ever have discussions and conversations with Belinda about that
difference or change [in her demeanor] you observed [when she was in the
appellant’s presence]?

[Tammy
Harlan:]   Yes.

[Prosecutor:]  
Did you ever say anything to her about that?

[Tammy Harlan:]  
Yes.

[Defense
counsel:]   Again, I am going to object because this is obviously hearsay by
implication.

[Court:]  
That’s overruled.

[Prosecutor:]  
You understand, because we have talked about this, you are not allowed to tell
this jury anything Belinda ever said to you.  You understand that?

[Tammy
Harlan:]   I do, yes, ma’am.

[Prosecutor:]  
And you’re not going to try and slip that in in one of my questions or one of
his, are you?

[Tammy
Harlan:]   No, ma’am.

[Prosecutor:]  
You understand the rules?

[Tammy
Harlan:]   Yes.

[Prosecutor:]  
What did you say to Belinda in those discussions about the change in
personality you saw in her from when she was with her husband versus when she
was not?

[Defense
counsel:]   And that necessarily implicates a response and we object to it. 
It’s hearsay by implication.  

[Court:] 
Overruled.

[Tammy
Harlan:]   I would tell her to stand up to him and to tell him how she felt and
don’t allow him to treat her that way.

The
above exchange does not lead us to an inescapable conclusion that this question
was asked in an effort to prove the truth of hearsay statements.  See
Schaffer, 777 S.W.2d at 114.  Immediately before the question, Tammy
testified that Belinda was uncharacteristically submissive when she was in appellant’s
presence.  The trial court could have reasonably determined the purpose of this
question was simply to inquire whether Tammy ever brought Belinda’s behavior
change to her attention or offered her advice.  Furthermore, Tammy later
testified that appellant ridiculed Belinda’s appearance, house work, and
childrearing.  Tammy also expressed, “[W]e would be in the middle of a game and
he would snap at her and say things to her and I would always say, [‘]Stand
up.  Tell him -- stand up for yourself.[’]”  We conclude that this testimony
rendered harmless any hearsay violation.  See Anderson v. State, 717
S.W.2d 622, 628 (Tex. Crim. App. 1986) (“Inadmissible evidence can be
rendered harmless if other evidence at trial is admitted without objection and
it proves the same fact that the inadmissible evidence sought to prove.”).  We
overrule appellant’s seventy-third issue.

            In issues
seventy-five and seventy-seven, appellant complains about Tammy’s testimony
regarding appellant’s class reunion.  First, the prosecutor asked Tammy whether
she advised Belinda regarding the reunion:

[Prosecutor:]  
I want to change gears with you just a little bit, Ms. Harlan. Do you recall in
the summer of 1998 having a conversation with Belinda Temple about David
Temple’s class reunion?

[Tammy
Harlan:]   Yes.

[Prosecutor:]  
Did you give some advice to Belinda Temple in regards to the class reunion?

[Tammy
Harlan:]   Yes.

[Prosecutor:]  
What did you tell Belinda?

[Defense
counsel:]   That necessarily implies the other party’s conversation. It’s
hearsay by implication.

[Court:]  
That’s overruled.

[Tammy
Harlan:]   I told her that yes, she was going to go to the reunion and that I
would keep [E.T.] and that she needed to go get a dress and that she needed to
be there.

The same
evidence was earlier admitted without objection when Quinton testified that
Belinda did not attend the first night of the reunion and appellant did not
want her to attend the second night.  Hence, any error was rendered harmless.  See
Anderson, 717 S.W.2d at 628.  We overrule appellant’s seventy-fifth
issue.

            The Prosecutor then asked Tammy the
following question:  

[Prosecutor:]  
Tell the jury what you told Belinda after the high school reunion.

[Defense
counsel:]   That will be hearsay by implication.

[Court:]  
That’s overruled.

[Tammy
Harlan:]   I told her that she was an incredible woman and beautiful and to not
let what happened there --

[Defense
counsel:]   Excuse me.

[Court:]  
Now, that’s sustained.

The
trial court sustained appellant’s objection, but appellant did not request an
instruction to disregard or move for a mistrial.  Thus, the trial court
committed no error because it granted appellant all the relief he requested.  See
Young, 137 S.W.3d at 69.  We overrule appellant’s seventy-seventh
issue. 

In his
seventy-ninth issue, appellant argues the prosecutor injected hearsay when she
asked Rebecca Temple whether she remembered a period when appellant and Belinda
discussed divorce.

[Prosecutor:]  
Do you remember the time in 1998 when David and Belinda started talking about
getting a divorce?

[Defense
counsel:]   Well, that’s not true.  In the first place, it’s not true.  

[Prosecutor:]  
Judge, he’s arguing.

[Defense
counsel:]   In the second place, it calls for hearsay.

[Prosecutor:]  
An objection is a one-word response to you, Your Honor.

[Court:]  
Do you have an objection?

[Defense
counsel:]   I do.  I object.

[Court:]  
Okay.  What grounds?

[Defense
counsel:]   I object because it’s injecting false statements into the record
that there’s no basis for.  If it had been true, the only way she would know
about it is hearsay.

[Prosecutor:]  
Judge, that’s a speaking objection.

[Court:]  
That’s overruled.

[Prosecutor:]  
Do you remember that, Ms. Temple?

[Rebecca
Temple:]   Could you repeat the question?

[Prosecutor:]  
Yes, ma’am.  Do you remember in 1998 when David and Belinda started speaking
about getting a divorce?

[Rebecca
Temple:]   No.

            The
prosecutor asked Rebecca whether she remembered when appellant and Belinda discussed
divorce, necessarily inquiring about Belinda’s statements; thus, the prosecutor
sought an answer implying hearsay.  See Head, 4 S.W.3d 258. 
Nevertheless, no hearsay was presented because Rebecca answered, “No.”  The
prosecutor later asked appellant, without objection, whether he and Belinda
ever “had discussions and arguments about getting divorced . . . .”  Appellant
replied, “No ma’am, not at all.”  Finally, during jury argument, the State did
not make any reference to discussions between appellant and Belinda regarding
divorce.[9] 
Accordingly, we conclude the prosecutor’s improper question was harmless.  We
overrule appellant’s seventy-ninth issue.

B.   Jury Argument

            In his
twenty-fifth through sixty-seventh issues, appellant argues that the trial
court erred by overruling his objections to the State’s jury argument and the
State engaged in prosecutorial misconduct during argument.  According to
appellant, the improper argument included (1) injecting unsupported facts, (2)
lessening the burden of proof, (3) commenting on witnesses’ credibility, and
(4) accusing the Temple family of perjury.

The
purpose of closing argument is to facilitate the jury’s analysis of evidence
presented at trial to arrive at a just and reasonable conclusion based on the
evidence alone and not on facts that were not admitted into evidence.  Campbell
v. State, 610 S.W.2d 754, 756 (Tex. Crim. App. [Panel Op.] 1980).  The four
permissible areas of jury argument
are (1) summation of the evidence, (2) reasonable deductions
drawn from the evidence, (3) answer to opposing counsel’s argument, and (4) a
plea for law enforcement.  Brown v. State, 270 S.W.3d 564, 570 (Tex.
Crim. App. 2008).  The State is allowed wide latitude in drawing inferences
from the evidence as long as the inferences drawn are reasonable and offered in
good faith.  Cantu v. State, 939 S.W.2d 627, 633 (Tex. Crim. App.
1997).  A prosecutor may argue her opinion concerning issues in the case so
long as the opinion is based on the evidence in the record and does not
constitute unsworn testimony.  McKay v. State, 707 S.W.2d 23, 37 (Tex.
Crim. App. 1985).

Even
when a jury argument exceeds these
approved areas, it will not constitute reversible error unless the argument is
extreme or manifestly improper, violative of a mandatory
statute, or injects new facts harmful to the accused into the trial
proceeding.  Wesbrook v. State, 29 S.W.3d 103, 115 (Tex. Crim. App.
2000).  When reviewing alleged error in allowing improper
jury argument, the appellate court must analyze the
statement in light of the entire argument and not on isolated sentences.  Delarue
v. State, 102 S.W.3d 388, 405 (Tex. App.—Houston [14th Dist.] 2003, pet.
ref’d).  Error in allowing improper argument is generally non-constitutional
error that must be disregarded unless it affects the defendant’s substantial
rights.  See Tex. R. App. P. 44.2(b); Brown, 270 S.W.3d at 572.

To
complain on appeal about an improper jury argument, a
defendant must object at trial and pursue his objection to an adverse ruling.  Cockrell
v. State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996); Johnson v. State,
233 S.W.3d 109, 114 (Tex. App.—Houston [14th Dist.] 2007, no pet.).  A
defendant must object each time an improper argument is made, or he waives his
complaint, regardless of how egregious the argument.  See Valdez v. State,
2 S.W.3d 518, 521–22 (Tex. App.—Houston [14th Dist.] 1999, pet. ref’d); Wilson
v. State, 179 S.W.3d 240, 249 (Tex. App.—Texarkana 2005, no pet.).  In examining challenges to jury argument, we
consider a prosecutor’s remark in the context in which it appears.  Gaddis
v. State, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).  

1.  
Unsupported-Argument Contentions

            Appellant contends that the
prosecutor persistently injected facts outside the record during argument in an
attempt to vilify appellant.  In his twenty-sixth issue, appellant argues the
trial court erred by overruling his objection to the prosecutor’s reference to certain
inadmissible hearsay statements.[10]


[Prosecutor:]  
And you got a small glimpse into their marriage.  You got a small glimpse,
because, see, Belinda’s not here to tell you, is she?  And the rules of
evidence prohibit Belinda’s girlfriends from telling you anything Belinda ever
told them.  That’s the way --

[Defense
counsel:]   Excuse me. That’s implying that there’s other evidence, and we
object to it.  That the evidence is what it is.

[Court:]  
And that’s overruled.

[Prosecutor:]  
That’s the way the rules work.

We agree
with appellant that this argument improperly referred the jury to evidence
outside the record, namely, that Belinda’s friends had information about
appellant and Belinda’s marriage.  Argument that attempts to introduce matters
not in the record is clearly improper.  See Berryhill v. State, 501
S.W.2d 86, 87 (Tex. Crim. App. 1973).  Argument inviting the jury to speculate
about possible evidence that is not in the record is even more dangerous
because “it leaves to the imagination of each juror whatever extraneous ‘facts’
may be needed to support the conviction.”  Id.  Here, “[t]he argument of
the prosecutor entered the impermissible area of conveying to the jury that
there was evidence of guilt other than that which was before the jury.”  Boyde
v. State, 513 S.W.2d 588, 591 (Tex. Crim. App. 1974). 
Accordingly, the trial court erred by overruling appellant’s objection, and we
will consider this error in our harm analysis.

            In his
twenty-seventh issue, appellant contends the prosecutor engaged in misconduct
by arguing that appellant never took E.T. to the park on the day of the
murder.  However, the following evidence supports a reasonable inference that
appellant did not take E.T. to the park.

·       
E.T. was retrieved from school around
noon because he was sick with a fever, and appellant testified that he bathed
E.T. shortly before Belinda arrived home.  

·       
According to appellant, he and
E.T. traveled in rapid succession from Cimarron Park to Brookshire Brothers to
Home Depot and back to his house, but never went to Peckham Park. 

·       
Bernard Bindeman testified he saw
appellant driving south from an area near appellant’s parents’ house, which was
inconsistent with appellant’s testimony that he went directly to Home Depot
after leaving Brookshire Brothers.

·       
Officer Leithner testified, “So I
basically just asked him if he can identify [the parks he went to] and he initially
said Peckham County Park, I guess, but it wasn’t long, within seconds, he
changed that and said, [‘]No, it was, I think, [Cimarron] Park,[’] which is a
neighborhood park in his subdivision.”  

·       
Detective Schmidt testified that
officers went to both parks with a photograph of appellant’s truck, but nobody
remembered seeing the truck on Monday.  

Accordingly, we conclude
the State’s argument was reasonably deduced from the evidence.  We overrule
appellant’s twenty-seventh issue.

            In his twenty-eighth
and twenty-ninth issues, appellant contends the trial court erred by allowing
the prosecutor to argue that appellant’s expert, Max Courtney, opined none of
the recovered shotguns was the murder weapon.

 [Prosecutor:]  
Max Courtney, their own expert, agrees that of the five shotguns that were
recovered, not one of them had blood or tissue on the shotguns.  Not one.  

[Defense
counsel:]   Wait a minute.  I object to that.  That’s not his testimony.  He
didn’t examine the shotguns for that.

[Court:]  
That’s overruled.                                    

[Prosecutor:]  
Dean Holtke testified only yesterday, the same thing, the shotguns, no blood,
no tissue. There is no blood or tissue.  Max Courtney talked about one of the
defense exhibits, the shell that was found in this weapon right here, and I had
- - I said to him, “Is that shell consistent with the wadding we found?”  He
said “No.”  He examined 37 separate shells related to all different types of
cases, and I asked him “Did you find any shell, any of the waddings, any of the
shells that you cut open that matched the wadding in this case?”  And he said
“No. It did not.”  The fact is, their own expert has agreed that none of the
weapons recovered come back to anything about a murder weapon.  Where is the
murder weapon?

[Defense
counsel:]   That’s not correct.

[Court:]  
That’s overruled.

During
the presentation of evidence, Courtney agreed that, “[i]n every single one of
the shotguns that we’ve talked about for the last four-and-a-half weeks, there
was no blood or no glass found in any of those shotguns.”  Thus, the
prosecutor’s argument—that none of the shotguns stands out as the murder
weapon—was based on the evidence.  We overrule appellant’s twenty-eighth and
twenty-ninth issues.  

            In his thirtieth
and thirty-first issues, appellant contends the trial court erred by allowing
the prosecutor to argue that appellant’s family made a conscious decision to
forgive him for murdering his wife.

[Prosecutor:]  
The Temple family, what’s really going on here, you figured it out, if you use
your common sense, like Craig said, that you never check at the door when you
become a juror.  What’s going on here is that family has decided they have the
right to grant absolution to this defendant.

[Defense
counsel:]   Excuse me. That’s an assertion of fact not based on evidence.  We
object to it.

[Court:]  
That’s overruled, sir.

Immediately following the court’s
ruling, the prosecutor explained what she meant by “grant absolution.”

[Prosecutor:]  
That family has decided that in their mind they’re going to overlook, forgive,
forget and deny that he executed his pregnant wife because he might be a good
father to [E.T.], and they’re going to forget about it and they’re going to lie
about it and they want you to do the same thing.  The problem with that is, it
overlooks the truth and it denies justice to Belinda and [her unborn daughter].

Appellant
did not object to this argument.  Nor did appellant object when the prosecutor
argued, “And why did [the Temple family] deny everything?  You know why. 
Because that family knows him and that family knows what happened” and “[the
Temple family] had already committed to their lies and their story back [in
April 1999, when they testified before the grand jury].”  Because appellant
failed to object each time the prosecutor argued that the Temple family
conspired to lie on his behalf, appellant has waived any error.  See Valdez,
2 S.W.3d at 521–22.  We overrule appellant’s thirtieth and thirty-first
issues.        

            In his thirty-second
and thirty-third issues, appellant contends the trial court erred by overruling
his objection to the prosecutor’s argument that he hid the murder weapon.

[Prosecutor:]  
You knew from the get-go in this case that there were going to be problems and
you’ve heard all the problems.  Do we have the murder weapon?  No.  Did we ever
try to hide that from you?  No.  Why don’t we have the murder weapon?  Because
he got rid of it.

[Defense
counsel:]   Now, that’s – that’s not a reasonable deduction from the evidence. 
It is an assertion of fact.

[Court:]  
That’s overruled.

[Defense
counsel:]   It’s improper.

[Court:]  
That’s overruled.

The
following syllogism illustrates how this argument was reasonably deduced from
the evidence: a) appellant killed Belinda by shooting her with a shotgun[11];
b) no shotgun was identified as the murder weapon; therefore, c) appellant “got
rid of” the murder weapon.  We overrule appellant’s thirty-second and
thirty-third issues.

            In his thirty-fourth
and thirty-fifth issues, appellant contends the trial court erred by allowing
the prosecutor to argue the jury should not underestimate appellant’s ability
to have committed the murder.

[Prosecutor:]  
[I]f you think David Temple is not capable of it, you underestimate him.

[Defense
counsel:]   Object to that.  That’s beyond the record.

[Court:]  
That’s sustained.

[Defense
counsel:]   Assertion of fact.

[Court:]  
That’s sustained.

[Defense
counsel:]   And ask the jury to disregard the last statement.

[Court:]  
The jury will disregard the last statement and not consider it for any purpose.

[Defense
counsel:]   And that’s improper argument and we move for a mistrial.

[Court:]  
That’s denied.

Arguing
that appellant was capable of murdering his wife was not so “clearly calculated
to inflame the minds of the jury . . . as to suggest the impermissibility of
withdrawing the impression produced.”  See Huffman, 746 S.W.2d at
219 (quoting Carter, 614 S.W.2d at 824–25).  Accordingly, we presume the
jury adhered to the trial court’s instruction, see Colburn, 966 S.W.2d
at 520, and conclude the trial court did not abuse its discretion in denying
appellant’s motion for mistrial.  See Archie, 221 S.W.3d at 699.  We
overrule appellant’s thirty-fourth and thirty-fifth issues.

            In his
thirty-sixth issue, appellant contends the prosecutor engaged in misconduct by
speculating that Belinda did not want to spend every holiday with appellant’s
family.  Appellant’s objection was sustained, and the trial court instructed
the jury to disregard, but appellant did not move for a mistrial.  Thus, the
trial court committed no error because it granted appellant all the relief he
requested.  See Young, 137 S.W.3d at 69.  We overrule appellant’s
thirty-sixth issue.

In his thirty-seventh
and thirty-eighth issues, appellant contends the trial court erred by allowing
the prosecutor to argue that appellant was the “stud” of Katy High School and
SFA.

[Prosecutor:]  
Mr. Temple told you he was difficult to discipline at a young age.  Using your
common sense, you know he was the stud of Katy High School and he went on to be
the stud of Stephen F. Austin University.

[Defense
counsel:]   Excuse me.  I object to that language and to that assertion. 
That’s not in the record.  We ask that she stay in the record.

[Court:]  
That’s overruled.

Multiple
witnesses testified that appellant was a standout football player both in high
school and in college.  For example, when asked about appellant’s football
career at SFA, appellant’s father testified, “He was a true asset to the team
and received a lot of publicity.”  Accordingly, notwithstanding the
colloquialism, arguing that appellant was the “stud” of high school and college
was a reasonable deduction from the evidence.  We overrule appellant’s
thirty-seventh and thirty-eighth issues.

            In issues
thirty-nine through forty-two, appellant contends the trial court erred by
overruling his objections to the prosecutor’s arguments that appellant treated
Belinda poorly when others were not around.

[Prosecutor:]  
And that second night when he took her to the reunion, what did Tammy Harlan
tell you she told Belinda after that second night?  “It’s okay, Belinda. You’re
a beautiful lady.  Don’t let it bother you.”  How do you think he treated
Belinda when Tammy and Quinton weren’t around?

[Defense
counsel:]   Now that’s an assertion of fact.  It’s not based on the evidence. 
We object to that.

[Court:]  
And that’s overruled.

[Prosecutor:]  
Why do you think Tammy Harlan, when they began out -- started out being best
friends with David and Belinda grew to dislike David Temple so much?  He didn’t
do anything to Tammy.  He didn’t do anything to Quinton. It was how he saw --
she saw how he treated Belinda.  Do you think Tammy Harlan got up there and
made up that David Temple called the Lucases white trash?  And if he could call
Belinda’s family white trash in front of Tammy and Quinton, what do you think
he said about the Lucases to Belinda when they were home alone and what do you
think that did to her self-esteem?  And, more importantly, what does that--

[Defense
counsel:]   There’s no evidence of that.

[Court:]  
That’s overruled.

[Prosecutor:]  
What does that say about how he really felt about Belinda?

Rhetorical
questions are generally within the scope of jury argument as long as they are
based upon a reasonable deduction from the evidence.  See Wolfe v. State,
917 S.W.2d 270, 280 (Tex. Crim. App. 1996).  It was reasonable for the
prosecutor to infer that if appellant derided Belinda and her family when
others were present, he did so to a greater extent when he and Belinda were
alone; Quinton testified that appellant boasted he was “in control” of his
house.  Furthermore, the prosecutor’s statement that appellant’s comments
affected Belinda’s self-esteem was also a reasonable deduction from the
evidence; Tammy testified that when Belinda was in appellant’s presence she
“was submissive and meek and wasn’t the person that she exhibited to be around
me.”  We overrule appellant’s thirty-ninth through forty-second issues.

In his forty-third
and forty-fourth issues, appellant contends the trial court erred by allowing
the prosecutor to argue that appellant was under “a lot of pressure.”

[Prosecutor:]  
Heather Scott also told you back at that time in her life she craved attention.
Her words, not mine.  So where all do you think the sources of pressure were
coming from on David Temple?  A little bit from Heather, a lot from Belinda, a
new baby was coming, arguments in the household.  There was a lot of pressure
on David Temple.  

[Defense
counsel:]   Excuse me. That’s beyond the record.  There’s no evidence of that. 

[Court:]  
That’s sustained.

[Defense
counsel:]   Ask that the jury disregard it.

[Court:]  
The jury will disregard that last portion and not consider it for any purpose.

[Defense
counsel:]   Judge, that’s the kind of assertion of fact that’s improper and we
move for a mistrial.

[Court:]  
That’s denied.

[Defense
counsel:]   Under Berger v. United States.

[Court:]  
That’s denied.

The
argument that appellant was under “a lot of pressure” had evidentiary support;
there was evidence appellant was struggling with an extra-marital relationship
weeks before his daughter would be born and that he had told Quinton Harlan he
was not sure if he was willing to leave his wife in order to continue this extra-marital
relationship.  Furthermore, even if erroneous, this argument was not so
egregious that it could not have been disregarded by the jury.  See Huffman, 746
S.W.2d at 219 (quoting Carter, 614 S.W.2d at 824–25).  Accordingly, the
trial court did not abuse its discretion by denying appellant’s motion for
mistrial.  See Archie, 221 S.W.3d at 699.  We overrule appellant’s
forty-third and forty-fourth issues.

            Appellant
next contends that the prosecutor engaged in misconduct by arguing that Shaka
always barked and jumped against the fence whenever someone walked past
appellant’s house.  However, several witnesses’ testimony supported this
argument.  We overrule appellant’s forty-fifth issue.

In his
forty-sixth through forty-ninth issues, appellant contends the trial court
erred by allowing the prosecutor to argue that appellant failed to let Shaka in
the house and closed the door behind him when he thought a burglar was in the
house.

[Prosecutor:]  
Why didn’t he take anything inside with him?  If he ran across to get help from
Ruggiero and to drop [E.T.] off, why didn't he take anything in there with
him?  Nothing from the garage, not Mike Ruggiero and not the dog.  The dog, who
was their protective watch dog, who was there to protect, the one chance he had
to do something, David Temple didn’t let him in the house.  The little things
tell you the truth.

[Defense
counsel:]   Excuse me. There’s no such evidence, Judge.  I object to that.

[Court:]  
And that’s overruled.

[Defense
counsel:]   An assertion without basis of evidence.

[Court:]  
That’s overruled.

 [Prosecutor:]  
And why did David Temple close the door to the house if he thought a burglar
might be inside?  Wouldn’t you leave the door wide open in case there’s
somebody inside?  But David Temple shut the door.

[Defense
counsel:]   No.  Judge, that’s not the evidence.

[Prosecutor:]  
It is the evidence.

[Defense
counsel:]   The evidence of Ruggiero--

[Court:]  
That’s overruled.

We
conclude that both of these arguments were reasonably deduced from the
evidence.  It is undisputed that Shaka remained in the backyard when appellant
entered his house.  Further, Mike Ruggiero testified that, although the back
door could have shut because it “bounced off of something,” the door slammed
shut and he did not hear the sound of glass breaking, shattering, or tinkling. 
Thus, we overrule appellant’s forty-sixth through forty-ninth issues.

            In his
fiftieth issue, appellant contends that the prosecutor engaged in misconduct by
explaining why and how burglaries are committed.  Because appellant did not
object on the basis of prosecutorial misconduct, he has not preserved these
issues.  See Hajjar, 176 S.W.3d at 566.  Nevertheless, we would overrule
this issue even if preserved.  The prosecutor merely made the following
common-sense statements about burglaries: (1) persons commit burglaries to
steal; (2) burglars act quickly so they do not “get caught”; and (3) burglars
“take everything they possibly can that’s valuable.”  See Wright v. State, 178
S.W.3d 905, 932 (Tex. App.—Houston [14th Dist.] 2005, pet. ref’d) (holding
that appeals to common knowledge during jury argument are not improper).  We
overrule appellant’s fiftieth issue.

In his
fifty-second issue, appellant contends the trial court erred by overruling his
objection to the prosecutor’s argument that appellant removed his jewelry and
washed his hands after killing Belinda.[12]

[Prosecutor:]  
Why is that jewelry in that tray?  That jewelry is in that tray because when
David Temple got finished firing that shotgun in the back of Belinda’s head, he
had some blood on his hands and he washed his hands and he took all of his
jewelry off.

[Defense
counsel:]   There’s no evidence of that, Judge.

[Court:]  
That’s overruled.

[Defense
counsel:]   We object to that.  That’s pure assertion of fact. 

[Court:]  
That’s overruled, sir.

The
State presented evidence appellant’s jewelry was found in a tray, and damp
towels were found in the bathroom.  However, this evidence, without more, did
not support a reasonable inference that appellant washed Belinda’s blood from
his hands; thus, the prosecutor’s argument was merely speculative.  We hold
that the trial court erred by overruling appellant’s objection and will
consider the effect of this error in our harm analysis.

Finally,
in issues fifty-three and fifty-four, appellant contends the trial court erred
by allowing the prosecutor to argue that E.T. was either in the backyard or
garage when Belinda arrived home shortly before her murder.

[Prosecutor:]  
But you do know that when she got home that day, [E.T.] was not in the house. 
He was probably in the garage or in the backyard. And as soon as --

[Defense
counsel:]   There’s no such evidence like that.

[Court:]  
That’s overruled.

[Prosecutor:]  
[E.T.] didn’t hear anything.

[Defense
counsel:]   There’s no such evidence like that.

[Prosecutor:]  
[E.T.] didn’t hear anything, Judge.

[Court:]  
Overruled.

The
prosecutor did not assert as fact that E.T. was in the garage or the backyard. 
Instead, her point was that E.T. was not in the house at the time of the
murder.  The State and appellant stipulated that the doctors who interviewed
E.T. following the murder “found no evidence that [E.T.] had been a witness to
the murder,” and this stipulation was presented to the jury.  It was therefore
reasonable to argue that E.T. neither saw nor heard the fatal gunshot. 
However, it was also reasonable to argue E.T. must have been nearby because no
evidence indicated that E.T. was with someone other than Belinda or appellant
from the time Belinda arrived home from school until appellant arrived home
from Home Depot.  Consequently, the prosecutor did not stray from the record by
arguing that E.T. was not in the house but probably in the backyard or garage
at the time of Belinda’s murder.  We overrule appellant’s fifty-third and
fifty-forth issues.

2.  
Argument Regarding Burden of Proof

            In issues
fifty-five through fifty-seven, appellant contends the following arguments from
the State invited the jury to convict him on less than “beyond a reasonable
doubt”:

[Prosecutor:]  
When you all got picked to be put on this jury a month ago . . . . [, we]
talked about the fact that problems come up with cold cases.  That’s why they
become cold.

[Defense
counsel:]   Excuse me.  I object to that.  That’s also improper argument.

[Court:]  
And that’s overruled.

[Defense
counsel:]   Comparing other cases, Your Honor.

[Court:]  
That’s overruled.

[Prosecutor:]  
And your common sense tells you that if a case becomes cold, it’s not going to
be a case with overwhelming evidence.  That’s pretty common sense and basic, and
we agreed and you’re on this jury because you told me that you understand that
there will never be a case where every single one of your questions is
answered.  That would be impossible.

[Defense
counsel:]   Excuse me.  That’s asking the jury to disregard the burden of proof
being beyond a reasonable doubt.

[Court:]  
That’s overruled, sir.

. . . .

[Prosecutor:]  
What is the burden of proof?  What is beyond a reasonable doubt?  If you
believe after hearing all this evidence for five weeks with your heart and your
gut and your mind that David Temple is guilty of the murder of Belinda Temple,
what more could we ask you to do?

[Defense
counsel:]   Excuse me.  That lowers the burden of proof beyond a reasonable
doubt.

[Court:]  
That’s overruled.

First,
the prosecutor’s statements that “cold cases” do not have overwhelming evidence
of guilt and there are no cases where every question is answered were simply
appeals to common sense.  See Wright, 178 S.W.3d at 932.  

Second,
assuming the prosecutor’s statement that “beyond a reasonable doubt” should be
determined by “your heart and your gut” was improper, the error was waived
because the State had previously made substantially the same argument without
objection.  See Greenwood v. State, 740 S.W.2d 857, 860 (Tex.
App.—Dallas 1987, no pet.) (“There is no reversible error where the same . . .
argument is presented elsewhere during trial without objection.”). 
Accordingly, we overrule appellant’s fifty-fifth through fifty-seventh issues.

3.  
Argument Regarding Witness Credibility

            In his
fifty-eighth through sixty-third issues, appellant contends the trial court
erred by allowing the State to vouch for its witnesses’ credibility during jury
argument.  In issues fifty-eight and fifty-nine, appellant argues the
prosecutor improperly bolstered Detective Holtke’s credibility by arguing he
did not lie about the absence of a car seat in appellant’s truck.  However,
appellant waived any error because he did not object to this argument.  See
Tex. R. App. P. 33.1(a); Valdez, 2 S.W.3d at 521–22.  We overrule
appellant’s fifty-eighth and fifty-ninth issues.

            In his
sixtieth and sixty-first issues, appellant complains about the following:

[Prosecutor:]  
[Y]ou need to appreciate that for nine years these men [law-enforcement
personnel] sitting right here have known all those little details, all of them,
for nine years, and for nine years these people right here have been waiting
for a courtroom to be an open forum where all this evidence--

[Defense
counsel:]   I object to the inflammatory argument.

[Court:]  
That’s overruled.

[Defense
counsel:]   And going outside the record, Your Honor.

[Court:]  
That is overruled.

[Prosecutor:]  
They’ve been waiting nine years to have a jury like you sitting in a box to
finally be told all the little details of the truth, and that’s why I need to
say them all to you all today. 

We
disagree that the prosecutor’s first statement was inflammatory.  It was
undisputed that many detectives and officers from several branches of law
enforcement had been investigating Belinda’s murder since 1999.  The prosecutor
later argued without objection, “There is no such thing as a perfect
investigation.  You already know that.  They already know that.  They tried
their hardest for the last nine years in this case.”  Moreover, appellant
waived any complaint regarding the prosecutor’s argument that the investigating
officers wanted the jury to “be told all the little details of the truth”
because he failed to object.  See Tex. R. App. P. 33.1(a); Valdez,
2 S.W.3d at 521–22.  We overrule appellant’s sixtieth and sixty-first issues. 

In his
sixty-second and sixty-third issues, appellant argues the prosecutor engaged in
misconduct by improperly vouching for Clint Stockdick’s credibility.

[Prosecutor:]  
What did Clint Stockdick tell you, circumstantial evidence that he is?  They
never even had a 20-gauge.  There was never a yellow hull shot around the
Temples.  They were all 12 gauges.  Clint Stockdick has more honor in his little
finger than that family has in the whole mess of them.

[Defense
counsel:]   Excuse me. I object to that.  That’s – that’s inflammatory.

[Court:]  
That’s overruled.

Although
Clint’s and the Temple family members’ testimony regarding shotguns contradicted
at points, this argument was unnecessarily exaggerated.  Because great
importance is placed on convicting the accused based on the evidence and not on
emotion, we agree that the trial court erred in overruling appellant’s
objection.  See Stein, 492 S.W.2d at 551–52.  We will consider the
effects of this error in our harm analysis.

 

 

5.  
Accusing Temple Family of Perjury

Finally,
in his sixty-fourth and sixty-fifth issues, appellant contends the prosecutor
engaged in inflammatory argument by asserting that the whole Temple family
committed aggravated perjury.

[Prosecutor:]  
Because no matter how much you try to deceive and manipulate and lie, nobody
can do it perfectly.  That’s why circumstantial evidence, all the little things
that go together and tell the story are what the truth is.  And when you have a
family like the Temple family who pretend to be the paragon of Katy, Texas, and
they get up here -- one, two, three, four, five of them -- and they make a
mockery of the criminal justice system and they commit more aggravated perjury
in this trial than this building has heard in a decade.

[Defense
counsel:]   Excuse me, Judge.  That’s an inflammatory, improper argument.

[Court:]  
That’s overruled, sir. 

We hold
that the trial court erred by overruling appellant’s objection to the
prosecutor’s argument.  Although there was evidence supporting an inference
that the Temple family witnesses conspired to lie to protect appellant, arguing
that the Temple family committed “more aggravated perjury in this trial than
this building has heard in a decade” was a theatrical statement intended to
inflame the jury.  “[We] reassert the critical importance of convicting an
accused only upon that evidence presented, without attempting to inflame or prejudice
the minds of the jurors.”  Id.; see also Elliott v. State, 117
Tex. Crim. 180, 182, 36 S.W.2d 513, 514 (1931) (“Complaint is made of some
remarks of counsel for the state . . . that some of the witnesses for the
appellant had perjured themselves, which remarks should have been withdrawn at
the request of the appellant.”).  Thus, we will consider this error in our harm
analysis.[13]

 

C.   Harm Analysis

Having
determined that the trial court committed several errors, we now consider the cumulative
effect of these errors.  See Stahl v. State, 749 S.W.2d 826, 832
(Tex. Crim. App. 1988); Martin v. State, 151 S.W.3d 236,
242 (Tex. App.—Texarkana 2004, pet. ref’d); Harris v. State, 56
S.W.3d 52, 59 (Tex. App.—Houston [14th Dist.] 2001, pet. ref’d).  We will
not consider the effect of any waived errors.  Cf. Chamberlain v.
State, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (“[W]e are
aware of no authority holding that non-errors may in their cumulative effect
cause error.”).

1.  
Standard of Review

We
review the trial court’s erroneous evidentiary and jury-argument rulings for
harm under rule 44.2(b) of the Texas Rules of Appellate Procedure.  Tex. R.
App. P. 44.2(b).  We must disregard non-constitutional errors that do not
affect a criminal defendant’s “substantial rights.”  Id.  We may not
reverse for non-constitutional errors if, after examining the record as a
whole, we have fair assurance that the errors did not have a substantial and
injurious effect or influence in determining the jury’s verdict, or had but a
slight effect.  Casey v. State, 215 S.W.3d 870, 885 (Tex. Crim. App.
2007); Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). 
Stated differently, if we have “a grave doubt” that the result was free from
the substantial influence of the error, we must treat the error accordingly.  Burnett
v. State, 88 S.W.3d 633, 637–38 (Tex. Crim. App. 2002) (citation omitted). 
“Grave doubt” means that “in the judge’s mind, the matter is so evenly balanced
that he feels himself in virtual equipoise as to the harmlessness of the
error.”  Id. (citation omitted).

In
assessing the likelihood that a jury’s decision was adversely affected by the
errors, we consider everything in the record, including any testimony or
physical evidence admitted, the nature of the evidence supporting the verdict,
the character of the alleged error and how it might be considered in connection
with other evidence.  Motilla v. State, 78 S.W.3d 352, 355 (Tex. Crim.
App. 2002).  We may also consider statements made during voir dire, jury
instructions, the State’s theory, any defensive theories, closing argument, and
whether the State emphasized the errors.  Id. at 355–56.  We are also
cognizant that a trial court’s overruling of a defendant’s objections puts a “stamp of approval” on the
prosecutor’s improper cross-examination or jury argument, increasing the risk
of harm.  See Lee v. State, 971 S.W.2d 130, 131 (Tex. App.—Houston
[14th Dist.] 1998, pet. ref’d).

2.  
Analysis

As
determined supra, the trial court erroneously allowed the prosecutor to
ask appellant several improper questions and to make improper jury argument. 
Although these errors were precipitated by overzealous prosecution, we conclude
that, in light of the whole record, they did not have a substantial and
injurious effect or influence in determining the jury’s verdict.  

We begin
by considering the nature and amount of evidence presented by both sides. 
There was no eyewitness, DNA, or other physical evidence directly connecting
appellant to Belinda’s murder.  Nonetheless, despite the absence of direct
evidence, the circumstantial evidence presented was not negligible.  

·       
Appellant was involved in an extra-marital affair with Heather,
had left his pregnant wife and son during the New Year’s holiday to spend two
nights with Heather, and resumed his relationship with Heather a relatively
short time after Belinda’s death, including sending Valentine’s Day flowers a
month later.

·       
There was evidence supporting a finding that appellant criticized
Belinda’s weight, housekeeping, and childrearing, and that he detested
Belinda’s family.

·       
There was evidence supporting a finding that the burglary was
staged.

·       
There was evidence supporting a finding that the Temple family
conspired to protect appellant, including concealing truth about the family’s
shotguns and appellant’s affair.

·       
Appellant’s explanation for his trip to Brookshire Brothers and
then eastward to Home Depot was refuted by the length of time it took him to
enter Home Depot after leaving Brookshire Brothers and Bernard Bindeman’s
testimony that he saw appellant heading south from an area near appellant’s
parents’ house.  

·       
Appellant’s behavior and demeanor immediately following Belinda’s
death.

·       
Appellant’s untruthfulness regarding taking E.T. to a park and
placing E.T. in a child seat.

·       
Testimony from Quinton and Tammy that, following Belinda’s death,
appellant aggressively confronted them regarding their statements to the police
and grand jury, even following them in his truck.

When
viewed in total, the circumstantial evidence supports a finding that appellant
had a motive for killing Belinda and attempted to conceal facts by staging a
burglary and lying.  We cannot conclude the prosecutor’s speculative argument
that the tray holding appellant’s jewelry indicates he washed Belinda’s blood
from his hands was significant enough to substantially affect the jury’s
verdict.  Moreover, the prosecutor’s exaggerated question “[Y]ou didn’t give a
flip about the Lucases, did you?” merely emphasized evidence already before the
jury and did not affect whether the jury believed Tammy and Quinton (who
testified that appellant derided Belinda and her family) or appellant’s family
(who testified appellant never disparaged Belinda’s family).

Appellant
contends the prosecutor injected harmful and unsupported evidence by arguing
that Belinda’s girlfriends were prevented by rule from revealing what Belinda
had told them about her marriage.  Appellant relies on Fant-Caughman v.
State, in which the Amarillo Court of Appeals reversed the defendant’s aggravated
sexual-assault conviction because of the prosecutor’s improper jury argument. 
61 S.W.3d 25 (Tex. App.—Amarillo 2001, pet. ref’d).  We believe this case is
distinguishable.  In Fant-Caughman, the complainant was a
thirteen-year-old girl who was allegedly sexually-assaulted by the defendant.  Id.
at 27.  The court of appeals concluded the prosecutor’s argument that “I could
have been here with witnesses for several more days, because there are a lot of
people who know about these allegations” had a substantial effect on the jury’s
verdict.  Id. at 32.  Because the credibility of a minor who claims
sexual assault is always a significant issue in such cases, allowing the
prosecutor to inject this unsupported testimony, not subject to
cross-examination, unfairly bolstered the victim’s outcry.   

 

Here,
the question of whether appellant and Belinda had a strong marriage, although
important, was quite different.  There was an undisputed fact that strongly
inferred appellant and Belinda were having marital difficulties: appellant was
involved in an extra-marital affair while Belinda was pregnant.  Additionally,
Tammy and Quinton testified that appellant ridiculed Belinda, was controlling,
and was unsure if he was willing to leave Belinda for Heather.  Moreover, most
of the witnesses who testified that appellant and Belinda appeared to have a
happy marriage were Temple family members or persons not as familiar with the
Temples as the Harlans.  In light of this evidence, we hold that the
prosecutor’s reference to information possibly possessed by Belinda’s
girlfriends did not substantially affect whether the jury believed appellant
and Belinda had marital problems.

We
acknowledge there was some evidence supporting an inference that R.J.S. was
involved in Belinda’s murder, most significantly that a 12-gauge H&R
shotgun owned by R.J.S.’s father was recovered and contained a spent, reloaded
double-ought buckshot shell (a shell was never recovered at the crime scene). 
However, R.J.S. testified that, shortly before Belinda’s murder, he and several
friends went to a field to shoot shotguns, and he brought the H&R shotgun
and reloaded double-ought buckshot shells.  Based on this testimony, the jury
could have dismissed the H&R shotgun as the murder weapon.  Further, the jury
could have also concluded that the motive evidence relative to R.J.S. (Belinda
confronted his parents several times regarding his non-attendance at school and
pranking her house) paled in comparison to the motive evidence implicating
appellant.  Moreover, the jury could directly evaluate the testimony of
appellant and R.J.S. because both testified.  Succinctly, based on the
evidence, the jury could have reasonably concluded R.J.S. was not the murderer.

We also
recognize that, if the jury believed the three Roberts brothers’ testimony that
they heard a shotgun blast around the time appellant was at Brookshire
Brothers, it could have substantially affected whether the jury had a
reasonable doubt regarding appellant’s culpability.  However, none of the errors
substantially affected the credibility of the Roberts brothers’ testimony.

Admittedly,
witness credibility was crucial because of the lack of direct evidence. 
Several of the prosecutor’s improper questions and comments pertained to the
truthfulness of appellant and his family.  The prosecutor was persistent in
asking appellant to comment on witnesses’ veracity.  She also overzealously
argued that the Temples were perjurers.  Further, the prosecutor called
appellant a liar during cross-examination, after which the trial court
instructed the jury to disregard the comment but denied appellant’s motion for
a mistrial.   Nevertheless, considering these improprieties in light of the
whole record, we conclude they did not substantially influence the jury or require
a mistrial.

Appellant
argues that “he was repeatedly asked to comment on the veracity of other
witnesses[, giving the jury] a choice to believe Appellant or believe that he
was a liar and therefore a murderer.”  He relies primarily on United States
v. Geston, in which the Ninth Circuit Court of Appeals concluded that
similar questioning was prosecutorial misconduct impacting the defendant’s due-process
rights and resulting in reversible error because “witness credibility was
paramount.”  299 F.3d 1130, 1137 (9th Cir. 2002).

Under
Texas precedent, however, improper veracity questions are generally held
harmless because they merely emphasize the obvious: that the defendant
disagrees with the State’s witnesses’ factual assertions.  See, e.g.,
Streff v. State, 890 S.W.2d 815, 820–21 (Tex. App.—Eastland 1994,
pet. ref’d) (holding error caused by State’s improper veracity question was
harmless because there was contradicting testimony).  In Creech v. State, the
Court of Criminal Appeals agreed that the prosecutor’s question regarding
whether the arresting officer was lying was improper, but concluded that such
error was harmless because “[w]hen the appellant said that the officer was
lying, he was merely saying that his version of the affair was correct and that
of the officer incorrect.  We see nothing in such answer which would tend to
bring him into disrepute with the jury.”  168 Tex. Crim. 422, 424, 329 S.W.2d
290, 291 (1959); see also McKinney v. State, 491 S.W.2d 404,
408 (Tex. Crim. App. 1973) (concluding error caused by State’s improper
veracity questions was not reversible); Mason v. State, 449 S.W.2d
47, 49 (Tex. Crim. App. 1970) (same); Ayala v. State, 171 Tex.
Crim. 687, 689, 352 S.W.2d 955, 956 (1962) (same); Salcido v. State, 170
Tex. Crim. 572, 574, 342 S.W.2d 760, 761 (1961) (per curiam) (same).  By
denying that he ever made derogatory statements regarding Belinda’s appearance
or family, appellant necessarily implied that Tammy, Quinton, and Brenda were
lying.  The prosecutor’s questions, albeit improper, served primarily to stress
contradictions in the testimony.

Similarly,
we conclude that the prosecutor’s inflammatory arguments that the Temple family
committed “more aggravated perjury in this trial than this building has heard
in a decade” and “Clint Stockdick has more honor in his little finger than [the
Temple] family has in the whole mess of them,” did not substantially influence
the jury.  The prosecutor aggressively cross-examined the Temple witnesses
regarding inconsistencies between their trial and grand-jury testimonies.  For
example, despite the meeting on January 13, 1999 at which appellant informed
his family that he had been unfaithful to Belinda, at the April 1999 grand jury
hearings, appellant’s brothers and mother denied knowledge of an affair.  At
trial, appellant’s brothers explained that they did not lie to the grand jury
because they believe “affair” means long-term unfaithfulness.  In fact,
although they testified they were devastated by appellant’s revelations at the
family meeting, appellant’s brothers testified that they were not sure what
appellant’s unfaithfulness entailed, including whether he engaged in sexual
infidelity.  These types of semantic prevarications, along with the Temple
witnesses’ testimony that appellant had a wonderful marriage and never owned a
12-gauge shotgun despite evidence to the contrary, supported an inference that
the Temples conspired to misrepresent the truth in order to protect appellant.

By arguing
that members of the Temple family were aggravated perjurers, the prosecutor did
not inject unsupported and harmful facts,[14]
comment on appellant’s failure to testify,[15]
or attack appellant over the shoulders of defense counsel,[16]
but suggested a reasonable inference from the evidence, albeit in an
inflammatory manner.  These statements were not pleas for the jurors to abandon
objectivity and convict appellant based on their emotions.  See Torres v.
State, 92 S.W.3d 911, 920 (Tex. App.—Houston [14th Dist.] 2002,
pet. ref’d) (citing Brandley v. State, 691 S.W.2d 699, 712 (Tex. Crim.
App. 1985)).  Furthermore, before making these statements, the prosecutor
argued without objection:

[Y]ou heard
no less than five Temples tell you the loving relationship.  The perfect
marriage.  No problems.  Everything was just fine. . . .  The truth is in what
was being said that is untrue.  It’s a false picture, a false light that’s
being given to you.

The
prosecutor later argued without objection:

[Prosecutor:]  
That family has decided that in their mind they’re going to overlook, forgive,
forget and deny that he executed his pregnant wife because he might be a good
father to [E.T.], and they’re going to forget about it and they’re going to lie
about it and they want you to do the same thing.  The problem with that is, it
overlooks the truth and it denies justice to Belinda and [her unborn daughter].

. . . .

[Prosecutor:]  
And to the grand jury it wasn’t about little inconsistencies and it wasn’t
about a time lapse of nine years. It was about a -- a deliberate,
collaborative, conspiratorial lie the Temple family told, trying to say David
Temple never had a 12-gauge shotgun, and the story they dreamed up to justify
the only one he ever had was about the day he got hurt when mud got stuck in
the barrel. They didn’t get their injuries consistent way back then to the
grand jury, and it was only because of Clint Stockdick coming forward and
talking about the reality of the shotguns in the Temple family that we know for
sure that they’re liars.

Hence, the prosecutor
made several proper arguments regarding the Temple family’s deceitfulness that
were supported by the evidence.  Accordingly, it is unlikely the prosecutor’s
inflammatory arguments substantially influenced the jury.

Finally, we consider whether the
trial court erred by denying appellant’s motion for mistrial when the
prosecutor commented, “No, it’s just lied about.”  The prosecutor uttered this
statement after appellant testified that his assertion Shaka was in the garage
at the time of the murder was “not something that was dreamed up.”  The trial
court instructed the jury to disregard but denied appellant’s motion for
mistrial.

A mistrial is the trial court’s
remedy for improper conduct that is so prejudicial that expenditure of further
time and expense would be wasteful and futile.  Ocon v. State, 284
S.W.3d 880, 884 (Tex. Crim. App. 2009).  The standard
of review for the denial of a motion for mistrial
is abuse of discretion.  Archie, 221 S.W.3d at 699.  The reviewing court
should uphold the trial court’s ruling if it was within the zone of reasonable
disagreement.  Id. (citing Wead v. State, 129 S.W.3d 126, 129
(Tex. Crim. App. 2004)).[17]

Whether a mistrial should have been
granted involves most, if not all, of the considerations that attend a harm
analysis.  Id. at 700.  Therefore, a reviewing court balances the three
factors first enunciated in Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim.
App. 1998): (1) the severity of the misconduct (the magnitude of the
prejudicial effect of the prosecutor’s remarks); (2) the measures adopted to
cure the misconduct (the efficacy of any cautionary instruction by the trial
judge); and (3) the certainty of conviction absent the misconduct (the strength
of the evidence supporting the conviction).  Id. 

We
recognize a prosecutor’s sidebar comment that the defendant or a witness is a
liar may be incurable error.  See Wright v. State, 112 Tex. Crim. 214,
215–16, 16 S.W.2d 126, 127 (1929) (reversing because, after defendant
objected to prosecutor’s asking major defense witness if he had robbed a gas
station, prosecutor responded, “I want to show that he is not only a liar but
also a thief”); Roberts v. State, 107 Tex. Crim. 139, 146–48, 295 S.W.
609, 613 (1927) (op. on reh’g) (reversing, despite instruction to
disregard and apology from prosecutor, because prosecutor called defendant a
“damn liar” when defendant testified he had previously told the prosecutor that
the victim had a gun, a conversation about which the prosecutor had personal
knowledge); but see Seaton v. State, 564 S.W.2d 721, 724–25 (Tex.
Crim. App. [Panel Op.] 1978) (affirming, despite prosecutor’s comment, “[T]hat
is a lie and you know it,” in response to defense witness’s testimony that
prosecutor was not present when witness’s statement was notarized, because
instruction to disregard cured error and witness was not material), overruled
on other grounds by Rucker v. State, 599 S.W.2d 581 (Tex. Crim. App.
1979).  In the present case, however, we do not believe the prosecutor’s
statement incurably infected the jury.

We
acknowledge that the prosecutor’s comment was highly improper; she stated as
fact that appellant was lying about Shaka’s location at the time of the
murder.  Further, the trial court’s instruction to disregard the prosecutor’s “last
question” could have been made clearer, i.e., it was not a question,
but a sidebar comment that necessitated appellant’s objection.  Nevertheless, immediately
following the improper comment, defense counsel objected, “Excuse me.  Now
that’s -- Judge, you’ve got to stop that kind of stuff,” and the jury was sent
out of the room.  When the jury was brought back, the court gave its
instruction.  Thus, it is reasonable to assume the jury understood that they
were to disregard the prosecutor’s comment.

This
case is distinguishable from Roberts, in which the prosecutor called the
defendant a “damn liar” relative to an issue about which the prosecutor had
personal knowledge and, thus, actually knew if the defendant was lying.  See
Roberts, 295 S.W. at 613; see also Hanson v. State, 139 Tex.
Crim. 233, 242, 139 S.W.2d 573, 578 (1940) (explaining that the
harmfulness of the prosecutor’s statement in Roberts was that he
actually had personal knowledge regarding whether the defendant was lying). 
Instead, the prosecutor’s sidebar is more akin to the situation addressed in Williams
v. State, 549 S.W.2d 183 (Tex. Crim. App. 1977).  In Williams,
the complainant alleged defendant raped her at gun point.  Id. at 185. 
During cross-examination, the prosecutor asked the defendant if he and the
complainant “went the night together.”  Id. at 187.  When the defendant
responded, “We have had a relationship together,” the prosecutor commented,
“All right.  I can agree with that, at pistol point.”  Id. at 188.  The
Court of Criminal Appeals held that the trial court’s instruction to disregard
cured the improper sidebar remark.  Id.; see also Jones v. State, 504
S.W.2d 906, 907 (Tex. Crim. App. 1974) (holding instruction to disregard
sufficient when prosecutor responded, “I suspect you have, with good cause,” after
defendant testified he had been put in fear for his life many times). 

We
appreciate the prosecutor commented that appellant was lying about an important
issue: whether Shaka was in the backyard when Belinda was murdered.  If the
jury believed Shaka was in the backyard, the State’s “staged-burglary” theory
would be greatly strengthened because Shaka would have made it very difficult
for a burglar to access the back door.  As explained in footnote 3, there was
no credible eyewitness testimony that Shaka was in the backyard at the time of
the murder.  However, Detective Leithner testified that on the night of the
murder, he asked appellant how a burglar could have avoided Shaka.  According
to Detective Leithner, appellant did not answer but became more irritated. 
This testimony supported an inference that appellant was deceitful regarding
Shaka’s location at the time of Belinda’s murder.  During opening statement,
the prosecutor stated that it seems unlikely a burglar could have “got past
that dog” but did not express that appellant lied about the dog’s location.  In
his opening statement, appellant explained that Shaka was in the garage. 
During jury argument, the prosecutor argued without objection that
appellant recently fabricated his assertion Shaka was in the garage at the time
of the murder.  The prosecutor also argued the fact Shaka would have barked if
a burglar had come into the backyard is “a circumstance [appellant] and his
lying family cannot change.”  Hence, the issue regarding Shaka’s location was
contested from the beginning to the end of trial, and the jury was well aware
that the State disagreed with appellant’s account.  Accordingly, the trial
court’s determination that its instruction to disregard sufficiently cured the
prosecutor’s outburst was within the zone of reasonable disagreement.  Thus,
the court did not abuse its discretion by denying appellant’s motion for
mistrial.

In sum,
we cannot conclude that the trial court’s errors had a substantial and
injurious effect or influence on the jury’s verdict.  See Tex. R. App.
P. 44.2(b).  We note that appellant cites several cases in which the Court of
Criminal Appeals reversed a defendant’s conviction because of persistent
prosecutorial misconduct.  See Stahl v. State, 749 S.W.2d
826 (Tex. Crim. App. 1988); McClure v. State, 544 S.W.2d 390
(Tex. Crim. App. 1977); Boyde v. State, 513 S.W.2d 588 (Tex. Crim. App. 1974). 
In these cases, the prosecutors ignored trial court rulings, injected
unsupported and harmful facts, and sought to inflame the jury against the
accused.  See Stahl v. State, 749 S.W.2d 826, 831 (Tex. Crim.
App. 1988) (reversing after victim’s mother exclaimed, “May he rest in hell. 
May he burn in hell.  Oh, my baby,” when identifying a morgue photograph of
victim because court determined prosecutor intended, and repeatedly referred to,
the outburst); McClure, 544 S.W.2d at 393–94 (reversing after
prosecutor contravened trial court’s rulings by persistently arguing punishment
during guilt-innocence stage); Boyde, 513 S.W.2d at 591 (holding prosecutor’s
course of repeatedly ignoring the court’s rulings was reversible error despite
repeated jury instructions to disregard); see also, e.g., Cook v.
State, 537 S.W.2d 258, 561 (Tex. Crim. App. 1976) (reversing because prosecutor
went outside the record by arguing severed co-defendant will likely blame
defendant in subsequent trial just as defendant blamed co-defendant in current
case); Renn v. State , 495 S.W.2d 922, 924 (Tex. Crim. App.
1973) (reversing because prosecutor repeatedly called defendant epithets,
despite twenty-six sustained objections to such remarks); Grant v. State, 738
S.W.2d 309, 311 (Tex. App.—Houston [1st Dist.] 1987, pet. ref’d)
(reversing because prosecutor persistently contravened trial court’s rulings
and jury charge by arguing defendant’s breath-test refusal was evidence of
guilt).

We do
not perceive the same type of relentless misconduct in the present case. 
During the emotionally charged, four-week trial, the prosecutors occasionally
exceeded proper questioning and argument when attacking the credibility of appellant
and his family and also apparently disobeyed or ignored a few of the trial
court’s rulings.  While we certainly condemn such tactics, in light of the
whole record, we cannot conclude that these errors were so prejudicial, or so
inflamed the jury, that appellant was deprived of his substantial rights or a
fair trial.  See Tex. R. App. P. 44.2(b); Johnson v. State, 604
S.W.2d 128, 135 (Tex. Crim. App. 1980) (“A reading of the transcription of the
court reporter’s notes does not disclose a willful and calculated effort on the
part of the prosecution to deny appellant a fair and impartial trial.”).  Accordingly,
we overrule appellant’s remaining issues.  We affirm the trial court’s
judgment.

 

 

                                                                                    

                                                                        /s/        Charles
W. Seymore

                                                                                    Justice

 

 

 

Panel consists of Justices Yates,
Seymore, and Brown. (Seymore, J., concurring).

Publish — Tex. R. App. P. 47.2(b).









[1]
In April 1999, a grand jury failed to indict appellant.





[2]
Additionally, Michael Ruggiero testified that the back door shut after
appellant ran into his house, but he does not remember hearing the sound of
glass “tinkling.”





[3]
We acknowledge that the State expended substantial effort to establish that
appellant’s dog, Shaka, was in the backyard at the time Belinda was murdered.  This
fact would support the State’s contention that the burglary was staged because Shaka
was ferocious and would not have allowed a burglar to access the back door. 
Appellant testified that he placed Shaka in the garage before leaving for the
park.  Although several of the State’s witnesses testified they never saw the
dog in appellant’s garage, photographs taken by police on the night of the
murder clearly show a dog blanket and bowls in the garage on the left side of
Belinda’s SUV.  Further, several witnesses testified they did not hear Shaka
barking on the afternoon of Belinda’s murder, which is just as consistent with
Shaka being in the garage as it is with no burglar entering the backyard.

Angela Vielma was the only witness who saw appellant
enter the garage upon his return from Home Depot.  She testified that she did
not see a dog in the garage.  Nevertheless, Vielma also testified she did not
see another car in the garage and that, if there had been, she would not have
been able to see what was on the other side of the car.  Because it is undisputed
Belinda’s SUV was in the garage and Shaka’s blanket and bowls were on the other
side of the SUV, no rational jury could credit Vielma’s testimony that there
was no dog in the garage.  The only evidence arguably supporting a finding that
Shaka was in the backyard came from Detective Leithner, who testified appellant
was unresponsive and irritated when asked how a burglar could have avoided
Shaka.  Nevertheless, the evidence is sufficient to support appellant’s
conviction without a finding that Shaka was in the backyard.





[4]
In issues six, eight, ten, twelve, and fourteen, appellant contends that the
State’s questions relative to witness veracity abrogated his due-process
rights.  When objecting to these questions, appellant did not object on the
basis that the questions violated his due-process rights.  Thus, appellant has
waived his due-process complaints.  See Tex. R. App. P. 33.1 (general
rule is that party must make timely and specific objection at trial to preserve
issue for appellate review); Broxton v. State, 909 S.W.2d 912, 918 (Tex.
Crim. App. 1995) (“[E]ven constitutional errors may be waived by failure to
object at trial.”); Boulware v. State, 542 S.W.2d 677,
682 (Tex. Crim. App. 1976) (same).  Accordingly, we overrule appellant’s
sixth, eighth, tenth, twelfth, and fourteenth issues.





[5] Perhaps the best way for defense counsel to preserve
this type of issue would be to request to take the prosecutor on voir dire at
the time the question is posed in order to reveal the factual basis for the
question.  Cf. Cavender v. State, 547 S.W.2d 601, 603 (Tex. Crim. App.
1977) (explaining that trial court held hearing to determine good-faith basis
for prosecutor’s question); Gailey v. State, 671 S.W.2d 123,
124 (Tex. App.—Houston [1st Dist.] 1984, pet. ref’d) (explaining that
trial court held hearing outside jury’s presence after prosecutor asked question
allegedly in bad faith).  The proper time to challenge the basis for a question
is before or when the question is asked.





[6]
In Cavender, 547 S.W.2d at 602–03, the
prosecutor admitted that the factual basis for her questions stemmed from a
string of hearsay statements.  The Court of Criminal Appeals held this factual
basis was “bottomed on hearsay several times removed, far too tenuous to
justify the question.”  Id.  Here, based on the prosecutor’s explanation
at the new trial hearing, it is possible Belinda told Brenda she and appellant
were arguing about their daughter.  We do not believe this information would be
too tenuous a basis for the prosecutor’s question.  





[7]
In his nineteenth issue, appellant contends this question abrogated his right
to a fair trial.  Assuming he is arguing this question violated his due-process
rights, we overrule issue nineteen; appellant did not object on the basis of
due-process violation and it was not apparent from the context that appellant
was objecting because this question abrogated his right to a fair trial.  See
Tex. R. App. P. 33.1(a)(1)(A); Broxton, 909 S.W.2d at 918; Boulware, 542
S.W.2d at 682.





[8]
In issues sixty-eight, seventy, seventy-two, seventy-four, seventy-six,
seventy-eight, and eighty, appellant contends his due-process rights were
abrogated by the hearsay statements.  However, appellant did not object at trial
on the basis of violation of due process.  See Tex. R. App. P. 33.1; Broxton,
909 S.W.2d at 918; Boulware, 542 S.W.2d at 682.  Accordingly, we
overrule these issues.





[9]
We note the prosecutor admitted during the motion-for-new-trial hearing that
her basis for this question was “someone told [her] Belinda said they had
discussed divorce.”  Hence, this question was not without factual basis but
was, as appellant suspected, based on hearsay.





[10]
In his twenty-fifth issue, appellant contends the prosecutor committed
misconduct by making this argument.  Because appellant did not object on the
basis of prosecutorial misconduct, he has not preserved this issue.  See Hajjar
v. State, 176 S.W.3d 554, 566 (Tex. App.—Houston [1st Dist.] 2004, pet.
ref’d) (recognizing prosecutorial misconduct is an independent basis for
objection that must be specifically urged in order for error to be preserved). 
We overrule issue twenty-five.





[11]
At least the evidence, taken as a whole and viewed in the light most favorable
to the verdict, is sufficient to support such a finding.





[12]
In issue fifty-one, appellant contends the prosecutor committed misconduct by
making this argument.  Because appellant did not object on the basis of
prosecutorial misconduct, he has not preserved this issue.  See Hajjar,
176 S.W.3d at 566.  We overrule issue fifty-one.





[13]
In issues sixty-six and sixty-seven, appellant complains that the prosecutor
accused the family of conspiring to commit perjury; appellant did not object to
this argument.  Despite appellant’s contention that an objection would have
been futile because the trial court had just overruled the prosecutor’s
argument that the Temple family committed aggravated perjury, we conclude he
waived any error by failing to object.  See Valdez, 2 S.W.3d at 521–22. 
Thus, we overrule issues sixty-six and sixty-seven.





[14]
See Jackson v. State, 17 S.W.3d 664, 673–74 (Tex. Crim. App.
2000) (“To constitute reversible error, the argument must be manifestly
improper or inject new, harmful facts into the case.” (emphasis added)).





[15]
See Bustamante v. State, 48 S.W.3d 761, 764 (Tex. Crim. App. 2001)
(“Neither the trial judge nor the prosecutor can comment on the failure of an
accused to testify.  Such a comment violates the
privilege against self-incrimination and the freedom from being compelled to
testify contained in the Fifth Amendment of the United States Constitution and
Article I, § 10, of the Texas Constitution.” (citations omitted)).     





[16]
See Davis v. State, --- S.W.3d ---, No. AP-74,393, 2010 WL 3766661,
at *19 (Tex. Crim. App. Sept. 29, 2010) (“We have consistently held that
argument that strikes at a defendant over the shoulders of defense counsel is
improper.”); Cockrell, 933 S.W.2d at 101 (“For many years this Court
has recognized prosecutor’s arguments which personally attack defense counsel
are manifestly improper because they serve to inflame the minds of the jury to
the accused’s prejudice.”).     





[17]
We note that appellant contends the prosecutor’s outburst abrogated his right
to a fair trial.  Presumably, appellant is arguing the prosecutor’s misconduct
was so egregious that it violated his constitutional right to due process, and,
thus, harm should be determined under a Rule 44.2(a) harmless-error analysis. 
We need not decide whether this particular outburst was constitutional or
non-constitutional error because the trial court sustained appellant’s
objection and denied his motion for mistrial; the Court of Criminal Appeals
recently explained that denials of a motion for mistrial are not subjected to a
harm analysis but are reviewed for abuse of discretion.  See Archie,
221 S.W.3d at 699–700; id. at 701–02 (Keller, P.J., concurring).